**Harold E. KOHN, Trustee, Plaintiff,**

v.

**AMERICAN METAL CLIMAX, INC.,**
and
**Roan Selection Trust, Limited,
Defendants.**

Civ. A. No. 70-933.

United States District Court,
E. D. Pennsylvania.

June 8, 1970.

Dilworth, Paxson, Kalish, Kohn & Levy, by Harold E. Kohn, Stuart H. Savett, Barney Welsh, Philadelphia, Pa., for plaintiff.

Drinker, Biddle & Reath, by Morris R. Brooke, Philadelphia, Pa., and Sullivan & Cromwell, by Marvin Schwartz, John L. Warden, Carroll Neeseman, New York City, for defendant American Metal Climax.

Pepper, Hamilton & Scheetz, by John Harkins, Philadelphia, Pa., and Cravath, Swaine & Moore, by John W. Barnum, and Robert S. Rifkind, New York City, for defendant Roan Selection Trust.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER.

MASTERSON, District Judge.

### I. FINDINGS OF FACT

#### A. NATURE OF ACTION AND JURISDICTION.

1. This is an action brought in three counts by plaintiff, Harold E. Kohn, trustee for the Pension Plan of Harold E. Kohn, P.A., attorneys-at-law, against defendants, American Metal Climax, Inc., (AMAX) and Roan Selection Trust, Ltd., (RST). It is brought both as a derivative action on behalf of RST and as a class action on behalf of all shareholders of RST, except AMAX, and principally seeks to enjoin AMAX from acquiring some of the assets of RST remaining after the acquisition of control of RST by the Government of Zambia.

2. Count I is brought under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5. In substance, it charges that AMAX conspired with one or more of the directors of RST to perpetrate a fraud on the non-AMAX shareholders of RST and that pursuant to this conspiracy AMAX made untrue statements of material fact and omitted to state other material facts necessary to be stated in order to make the statements made not misleading.

3. Count II charges AMAX with the above-mentioned fraud and with a breach of fiduciary duty owed to RST and its non-AMAX shareholders.

4. Count III is brought only as a derivative action on behalf of RST. It charges that the proposed acquisition of RST by AMAX is violative of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that an alleged interlocking of directorates between AMAX and RST is violative of Section 8 of the Clayton Act, 15 U.S.C. § 19.

5. The Court has subject-matter jurisdiction over Count I under section 27 of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78aa.

6. The Court has subject-matter jurisdiction over Count II under 28 U.S.C. § 1332.

7. The Court has subject-matter jurisdiction over Count III under 15 U.S.C. § 26.

8. Venue is proper in this District under section 27 of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1391(c) and (d), § 1401.

9. This Court has personal jurisdiction over the defendants.

## B. PRINCIPALS INVOLVED.

10. Plaintiff, Harold E. Kohn, Trustee, for the Pension Plan of Harold E. Kohn, P.A., Attorneys-at-law, holds American depositary receipts representing 2,000 ordinary shares of Roan Selection Trust, Ltd., (RST) which are listed for trading on the New York Stock Exchange. Plaintiff is a citizen of the Commonwealth of Pennsylvania, resides in the Eastern District of Pennsylvania, and purchased such American depositary receipts on January 14, 1970. (Uncontested Fact No. 1).

11. There are approximately 40,000 shareholders of RST in the United States (see Uncontested Fact No. 10) and United States citizens, other than AMAX, own approximately 37.7% of RST. (Uncontested Facts Nos. 5 and 9).

12. Defendant, American Metal Climax, Inc. (AMAX), a listed company on the New York Stock Exchange, is a New York corporation with its principal place of business at 1270 Avenue of the Americas, New York, New York, and is licensed to do business in the Commonwealth of Pennsylvania. (Uncontested Fact No. 2). AMAX is a major producer, fabricator and marketer of metals and minerals. AMAX is the owner of 42.3% of the issued shares of RST. (Uncontested Fact No. 5, in part).

13. Defendant RST is a corporation organized and existing under the laws of the Republic of Zambia, with its principal place of business in Zambia. RST's executive office is located at Kafue House, Cairo Road, Lusaka, Zambia; its central and registered office is located at Mpelembe House, Broadway, Ndola, Zambia. RST, since at least 1955, has reported annually to the Securities and Exchange Commission (SEC) on Form 20–K with its Annual Report to Shareholders annexed. Its principal business is the production, smelting and refining of copper in Zambia. (Uncontested Fact No. 3).

14. The Morgan Guaranty Trust Company of New York (Morgan), the American depositary of RST shares, regularly performs the following functions:

(a) mails annual quarterly reports supplied to it by RST to registered American shareholders of RST (Deposition of Regis E. Moxley, Vice-President of Morgan, p. 6);

(b) distributes cash dividends of RST to American shareholders (Moxley Dep., p. 8);

(c) mails other reports, announcements, documents and circulars of RST to American shareholders (Moxley Dep., pp. 10–13).

In performing these services, Morgan is paid by RST. The fees paid Morgan by RST for these and other services amounted to over $300,000 for the period July 1, 1968, to June 30, 1969. (Plaintiff's Exhibit, hereinafter "PX", No. 22).

15. At all times material to this action, RST had 13 directors, six of whom were and are directors of AMAX; of the six common directors, three are present and two are former officers of AMAX; the other seven directors of RST, including the Chairman, Executive Vice-Chairman and the President of RST, are neither directors nor officers of AMAX. (Uncontested Fact No. 5, in part).

## C. NATIONALIZATION OF RST.

16. In the spring of 1968, the Zambian Government announced a limitation of dividends that may be paid outside the country to 50% of net profit. This is commonly referred to as the Mulinguishi Declaration. (Uncontested Fact No. 7).

17. On August 11, 1969, the President of Zambia announced ("Matero Declaration") the desire of the Zambian Government to acquire controlling equity interests in the operating copper properties in Zambia. Thereafter, RST was invited by the Government to negotiate the sale of 51% interest in the copper producing, smelting and refining businesses conducted in Zambia by certain of its operating subsidiaries. Under the circumstances, the Board of RST entered into negotiations with the Government. (Uncontested Fact No. 8, in part).

18. Negotiations with the Zambian Government were conducted on behalf of RST by Messrs. Vuillequez and R. H. Page, RST's Executive Vice-Chairman and Chief Financial Officer, respectively. AMAX did not take part in the negotiations between RST and the Government of Zambia, but was kept advised of the progress of such negotiations by RST, supplied technical assistance to RST in the drafting of proposals, advised RST of its views as to certain of the issues, and made known to RST, prior to execution of the agreement, its opinion that the agreement was as favorable to RST as could be expected under the circumstances. (Uncontested Fact No. 12).

19. On November 17, 1969, the RST board met and unanimously approved an agreement in principle to be entered into between the Government, the Industrial Development Corporation of Zambia, Ltd. (INDECO) (a Government corporation) and RST. The Board also unanimously approved a statement to be issued by Sir Ronald Prain, Chairman of the Board of RST, dated November 17, 1969. At the meeting, Vuillequez recorded his appreciation of the RST negotiating team for the cooperation of AMAX during the negotiations with the Government. Also at that meeting, the following statement was made by F. Taylor Ostrander and R. J. Wright, both alternate directors of RST and employees of AMAX, on behalf of AMAX:

As with any negotiation, we are sure there have been ups and downs, there are matters of satisfaction and of disappointment.

Now we have before us a negotiated package deal, of greater complexity, that has received the approval of the President [of Zambia] and the ratification of his cabinet. The major details of this package deal were approved in principle by the AMAX Board on November 6, subject to satisfactory agreement on externalization.

On the whole, we feel that shareholders have come out of the matter not too badly.

On behalf of our principals and for AMAX as a whole, we particularly want to express our appreciation for the difficult negotiating job so successfully completed by your negotiating team, and for the effective leadership and support that was provided by the whole RST organization.

The minutes of the AMAX board contain no reference to any approval of the agreement reached between RST and Zambia. Mr. Ian MacGregor, who is Chief Executive Officer of AMAX and a director of RST, testified at his deposition, on page 37, that the AMAX board was not asked to pass on this matter. (Uncontested Fact No. 13).

20. On November 17, 1969, Prain issued a statement, which was sent to RST stockholders, that RST and the Government of Zambia had agreed on the principal terms by which the Government would acquire a majority interest in the mining interests of RST. (Uncontested Fact No. 14, in part). The salient provisions are (PX-2):

(a) that the aforesaid operations would be merged into the company to be known as Roan Consolidated Mining, Ltd. (RCM) in which INDECO would own 51 percent, RST approximately 37 percent, and the remainder by other companies known as the Anglo-American Group because of its minority interest in certain of the RST companies;

(b) that in payment for such operation, INDECO would issue negotiable bonds guaranteed by the Zambian Government in the amount of $151,000,000 of which RST would receive 75 percent;

(c) that RST will manage the operations of RCM and act as sales agent for a minimum period of 10 years, for which RST will receive one and one-half percent of RCM's gross sales revenue plus two percent of RCM's profits after mineral taxes but before income taxes;

(d) that RCM will pay quarterly dividends not subject to dividend limitation and which will equal the net income of RCM after provision for reserve for exploration and development in an amount approved by the entire board of RCM;

(e) that *all* of the assets of RST except those sold to the Zambian Government will be transferred to a new corporation outside of Zambia and that such assets consist principally of cash of approximately $40,000,000, a 30 percent interest in Botswana RST Ltd. (BRST), interests in Baluba Mines Limited and certain other exploration companies, the Ametalco group of companies,[1] the aforesaid INDECO bonds *and* RST shares in RCM. The November 17 announcement ends with the following statement:

"The board [of RST] expressed its confidence that the agreement [with the Zambian Government] would afford a sound basis for future relationships in the interests both of the Republic of Zambia and of RST's shareholders."

21. By Memorandum to the Directors of RST dated December 10, 1969, Prain recommended, *inter alia*, that all of the RST assets, except cash balances to be externalized to a Luxembourg subsidiary and except those assets to be sold to the Zambian Government, be transferred to a newly formed corporation in another country under the name "RST International" and that RST become an international mining company. (PX-3; Notes of Testimony, hereinafter "N.T.",

1. AMETALCO, Inc., a New York corporation, is wholly owned by AMETALCO, Ltd., a United Kingdom corporation which is wholly owned by another United Kingdom corporation which is a 100% subsidiary of RST. AMETCO Shipping Co., a New York corporation, is wholly owned by AMETALCO, Inc., which was purchased by RST from AMAX in 1963 for a consideration of one million shares of RST. The Chairman of the board of AMETALCO, Inc., is Sir. Ronald Prain (Prain) who is also chairman of the Board of RST and a director of AMETALCO, Inc., AMETCO Shipping Co., and RST; Jean Vuillequez, Executive Vice-Chairman of RST is also a director of those three companies and and is chairman of the board of AMETCO Shipping Co. (Uncontested Fact No. 4).

444, 450–451). He also stated that the major shareholder (AMAX) had requested him to become chairman of the international corporation. (PX–3).

22. On December 11, the RST board met and unanimously approved Prain's recommendations. Ian MacGregor, who is Chief Executive Officer of AMAX and a director of RST, was present at that meeting and approved such resolution. (PX–3; PX–27; Uncontested Fact No. 16, in part).

23. On December 22, 1969, a committee of the directors of RST approved the agreement between and among the Republic of Zambia, INDECO and RST. (Uncontested Fact No. 18).

Under the agreement between the Zambian Government and RST dated December 24, 1969 INDECO will acquire at book value a 51% interest in the operating copper properties controlled by RST, in exchange for compensation in the form of bonds to be issued by INDECO and to be guaranteed by the Republic of Zambia. Among other things, the agreement provides that contracts will be entered into whereby RST or a company nominated by it will continue to act for a period of ten years as manager and sales agent of the operations. The agreement also states that the possessor of the management contract must hold not less than 24 percent (later negotiated to 20 percent) of the RCM stock.

The Zambian properties will be held by a Zambian company known as RCM (Roan Consolidated Mines, Ltd.), but referred to in the agreements as OPCO, hereinafter referred to as RCM, in which the Government will own a 51% stock interest, RST 36.75% and the remaining 12.25% will be owned by the Anglo-American Group which now holds a minority interest in RST's Zambian properties.

In addition, the agreement permits the assets of RST, not required for Zambian copper producing, smelting and refining, including the bonds and RCM stock referred to, to be received as com-

pensation from INDECO, to be transferred to holders outside Zambia.

This characterization of the agreement is not intended to be complete and the agreement contains other important provisions. (Uncontested Fact No. 19, in part; N.T. 187).

## D. ACQUISITION OF RST BY AMAX.

24. In mid-December 1969, Ian MacGregor, RST director and Chief Executive Officer of AMAX, proposed to RST an amalgamation of RST and AMAX. His purpose in doing so was to protect AMAX's investment in RST (N. T. 386).

25. On December 19, 1969, RST's management retained N. M. Rothschild & Sons, London merchant bankers, to assist it in discussions with AMAX. (N. T. 192–93, 160–61). On January 17, 1970, RST retained Kuhn, Loeb & Co., New York investment bankers, to work jointly with Rothschild's. (N.T. 503–08).

26. The two persons who were authorized by AMAX to negotiate on behalf of AMAX were MacGregor and Donahue (President of AMAX), who were and are members of the RST board (PX–7). At these negotiations, MacGregor felt that the other shareholders (i. e. non-AMAX shareholders) of RST "were being more than amply represented by directors other than myself." (N.T. 395). Indeed, MacGregor stated, "I have only one company, American Metal Climax." (N.T. 386).

27. After several months of negotiations, in which Rothschild's and Kuhn, Loeb represented and advised RST (N.T. 163), the Agreement in Principle for the amalgamation of AMAX and RST, dated March 5, 1970 (PX–9) was entered into. (Uncontested Fact No. 25). In essence, the agreement provides for the consolidation of RST's Zambian operating assets into Roan Consolidated Mines, Limited ("RCM"), a Zambian corporation, 51% of which will be sold to INDECO for INDECO bonds, pursuant to the

agreement of December 24, 1969 with the Government of Zambia; pro rata distribution to all RST shareholders of the INDECO bonds thus acquired; pro rata distribution to all RST shareholders of RST's shares of Botswana RST Limited; pro rata distribution to all RST shareholders of the shares in RCM, except to the extent that the Zambian Government has required 20% of the RCM shares to be retained by RST, and acquisition of the remainder of RST by AMAX, for which AMAX will pay to other RST shareholders approximately $76.2 million principal amount of 8% AMAX subordinated debentures with common stock warrants attached and $6.3 million in cash. (PX–9).

28. More specifically the agreement in principle provides for the following (PX–6; PX–9; DX–6A);

Non-AMAX shareholders of RST, who own 25.4 million or 57.7% of the total RST shares, will receive the following in complete redemption of their shares:

(a) $6.3 million in cash, representing $.25 per RST share.

(b) Their approximate pro rata share ($2 principal amount per RST share) of the 6% Zimco bonds.

(c) Approximately 16.75% of the shares of RCM.

(d) Their pro rata share (57.7%) of RST's 30.2% (947,401 shares) of Botswana RST Limited, which has a controlling interest in a proposed Botswana copper-nickel mining venture.

(e) Approximately $76.2 million principal amount ($3 principal amount per RST share) of 8% AMAX debentures, subordinated to all present and future AMAX debts, due January 1, 1986, with one seven-year AMAX common stock warrant attached to each $100 principal amount of debentures. The warrants will be exercisable at $47.50 per share and will be detachable and exercisable six months after issuance.

After the reorganization, RST will be a wholly-owned subsidiary of AMAX and RST will own the following:

(i) Approximately 42.3% of $40 million principal amount of the Zimco bonds to be received by RCM;

(ii) 42.3% of RST's present interest in Botswana RST;

(iii) 20% of the shares of RCM;

(iv) 100% of the Ametalco group of companies;

(v) The contracts to manage the RCM mines and to sell their output pursuant to previously announced agreements in principle with the Zambian Government;

(vi) Miscellaneous exploration and other assets both inside and outside of Zambia; and

(vii) Net current assets of approximately $63 million remaining in the RST Group, based on estimated January 1, 1970 figures.

AMAX will receive, *inter alia*, the following benefits if the Agreement in Principle between RST and AMAX is consummated:

(a) AMAX's annual income will be increased by $7 million calculated at a $.50 per pound copper price;[2]

(b) AMAX's cash flow will be improved by $134 million over the period of 1970–1975;

(c) AMAX's foreign balance of payments position will be improved by $91 million;

(d) Although AMAX will increase its net exposure in Africa by about $24 million, 4½ years of incremental earnings after the acquisition will recoup this; (PX–5, p. 1).

(e) AMAX will be acquiring high yielding assets. (PX–5, p. 6).

29. At a March 5, 1970 meeting, the Board of AMAX approved the agreement in principle unanimously. The members of AMAX who were either

---

2. Between January 9, 1970 and May 4, 1970, the closing bids for cash on the London Metal Exchange for electrolytic copper wirebar ranged between 71.46 cents and 78.38 cents per pound. (Uncontested Fact No. 35).

directors or alternate directors of RST abstained from such vote on advice of counsel although they stated they would support adoption of said plan. At that meeting MacGregor read to the AMAX Board a draft of a press release which was to be published as promptly as possible. The minutes of that meeting record the following:

> The Chairman thereupon read to the Board a draft of a press release which would be published as promptly as possible in London and New York after prior notification to the Zambian authorities at Lusaka. (Uncontested Fact No. 28).

30. On March 6, 1970, the committee authorized by the previous RST Board meeting met and voted to accept the agreement in principle and that a joint announcement of RST and AMAX be released to the stock exchanges and the press on March 6, 1970, and be distributed to shareholders on March 10, 1970. (Uncontested Fact No. 29).

31. On March 6, 1970, a joint announcement relating to the terms of the Agreement in Principle between AMAX and RST was made by RST and AMAX and was transmitted by Morgan on behalf of RST and received by plaintiff in this judicial district.

32. The March 6, 1970 joint announcement of RST and AMAX to RST's stockholders was designed to advise RST stockholders in summary form of the broad outline of occurrences and arrangements important to the future of the company. There were no misstatements of fact in this communication and, in view of its preliminary nature, there were no omissions of material facts. (PX–6).

33. RST is at present engaged, with the assistance of its investment bankers and advice of counsel in Zambia, the United Kingdom, and New York in preparing a statement, in the nature of a proxy statement, concerning the proposed reorganization for the information of its shareholders. It is contemplated that the explanatory statement will be mailed to shareholders in June and a shareholders' meeting will be held in July. (N.T. 465).

34. For the agreement between AMAX and RST to take effect, it must be adopted by the vote of the holders of three-quarters of all RST shares represented in person or by proxy at the shareholders' meeting.[3] (Zambia Companies Ordinance, §§ 14, 104 (1965)).

35. Even if the required shareholder vote is obtained, the proposed reorganization will not be effectuated unless it is approved by the High Court of Zambia. (PX–9; Zambia Companies Ordinance, §§ 14–20, 95). When the proposed reorganization is presented to the High Court for approval, the High Court, under controlling precedent, must be satisfied that the proposed plan is fair and equitable to all shareholders. British and American Trustee and Finance Corporation, Limited and Reduced vs. Couper, (1894) A.C. 399; *See also* Magnus and Estrin, Companies Law and Practice (4th ed.).

36. AMAX has undertaken to obtain stock exchange listings for the debentures and warrants which it will issue. (PX–9). It is expected that the debentures will be listed on the New York Stock Exchange and that the warrants will be listed on the American Stock Exchange. (N.T. 574). Arrangements are

---

3. Counsel for AMAX has represented to the Court that RST will also present, for a separate vote. the agreement and reorganization to the non-AMAX shareholders of RST voting as a class. Even though no prescribed vote of this separate class is required for approval under the Zambia Companies Ordinance and even though the Agreement in Principle be-

tween AMAX and RST (PX–9) makes no specific mention of this special vote, counsel has assured us that the reorganization will not be consummated unless it is approved by a majority of the non-AMAX shareholders participating in the class vote. *See, e. g.,* Defendant's Trial Memorandum, p. 24.

being made for the listing in the United States of the RCM shares which will be distributed to RST's public stockholders (N.T. 570), and efforts are being made to likewise list the INDECO bonds which the RST public stockholders will receive. (N.T. 571). The Botswana shares are presently traded in the United States over-the-counter market. (N. T. 570–71).

37. AMAX' management, in seeking approval of the proposed reorganization by the AMAX board of directors, valued at $6.62 per share the package of securities which RST's stockholders will receive upon the proposed reorganization. (PX–5, p. 5). Mr. Wright of Kuhn, Loeb valued the same package as of March 5, 1970 at $7.13 per share. (N.T. 563). At that time, RST stock was trading on the New York Stock Exchange at $6.25 per share. (N.T. 564).

38. In view of the general stock market decline since March 5, 1970, Mr. Wright testified that the value of the package of securities to be distributed to RST's stockholders had declined to between $6.70 and $6.75 per share on May 18, 1970, when RST's stock was trading on the New York Stock Exchange at 5⅝'s. (N.T. 563–64).

39. Rothschild's and Kuhn, Loeb orally advised RST's Board of Directors prior to the execution of the agreement in principle between RST and AMAX that the proposed reorganization was fair and equitable and in the best interests of RST stockholders and that it was preferable to other reorganization proposals which had been considered. (N. T. 167–68, 452, 508).

## II. OPINION

The issues in this case are as follows:

(1) Whether this Court has *in personam* jurisdiction over RST;

(2) Whether the March 6, 1970 statement released to the press by the chairman of RST and AMAX and subsequently sent by RST to its shareholders violated Section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78 (1964), and Rule 10b–5 of the Securities Exchange Commission, promulgated thereunder;

(3) Whether the terms of the proposed reorganization of RST, whereby certain assets of RST and certain securities of AMAX will be distributed to the non-AMAX shareholders of RST in redemption of their shares, are unfair to the RST stockholders and constitute fraud and deceit upon, and a breach of fiduciary duty owed to, such shareholders by AMAX;

(4) (a) Whether the proposed reorganization, if effectuated, is violative of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1964), because it may substantially lessen competition in United States commerce, and (b) whether the alleged interlocking directorates of RST and AMAX are violative of Section 8 of the Clayton Act, 15 U.S.C. § 19 (1964).

### (1) JURISDICTION OF RST

RST has moved pursuant to Rule 12(b) of the Federal Rules of Civil Procedure for an order dismissing the complaint as to it on the ground that this Court lacks *in personam* jurisdiction over RST. RST does not challenge the propriety of the venue, the service of process or subject matter jurisdiction, but rather asserts that the maintenance of personal jurisdiction over it would be violative of due process of law under the principles outlined in International Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95 (1945).

Under *International Shoe*, in order to find that it is constitutional to exercise personal jurisdiction over RST we must find (1) that RST has minimum contacts with this forum and (2) that it is fair and reasonable to require the defendant to defend this action. *See also,* 2 Moore's Fed. Practice § 4.25[5], at 1169–70. We have concluded that this dual test has been satisfied.

We believe that RST has minimum contacts with this forum by virtue of

Morgan's activities on its behalf in communicating with RST's American shareholders. It is clear that RST communicates with its American shareholders solely through Morgan and that in performing this task, Morgan has regularly sent materials to RST shareholders who are domiciled in Pennsylvania. RST seeks to argue away these contacts on the ground that Morgan is acting as the agent of the American shareholders and not as the agent of RST by virtue of a contract with American shareholders included in their share certificates. Cutting through form, however, Morgan is performing tasks RST would perform if Morgan were not hired to do them and, at the very least, Morgan is the agent and vehicle by which RST communicates with its American shareholders. Further, it is these very contacts which give rise to this litigation since plaintiff challenges some of the documents he has received from RST through Morgan to be violative of the Securities and Exchange Act of 1934. Under these circumstances, we find RST to have minimum contacts with this forum.

Secondly, it does not offend our notions of fair play and substantial justice to exercise jurisdiction over RST. RST is an international corporation of major proportions. Several of its directors and alternate directors are American and it has held directors' meetings in the United States. Approximately 40,-000 United States citizens, including AMAX, own approximately 80% of RST. It certainly cannot be considered an undue hardship to require it to defend this action.

Accordingly, RST's motion to dismiss will be denied.

## (2) DISCLOSURE

 The plaintiff's allegation of violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U. S.C. § 78, and Rule 10b-5 promulgated thereunder, concerns the March 6, 1970 statement (PX-6) which was released to the press by the chairmen of RST and AMAX and subsequently sent by RST through Morgan to its shareholders. While we agree that, in an appropriate case, a United States District Court has the power to enjoin continuation of a course of conduct which violates Rule 10b-5,[4] we do not find that this is such a case. The statement of March 6, 1970 was issued for the salutary purpose of informing RST's shareholders and the investment community, in summary form, of the basic terms of the proposed reorganization immediately after their formulation and agreement. There were no affirmative misstatements in the statement. (Finding of Fact No. 32). As to the omissions which plaintiff complains would be material to informed stockholder decision, it is expected that the further statement, in the nature of a proxy statement, will supply all material information. We do not think that the defendants here can be held liable for alleged material omissions in a communication to stockholders which we have found to be summary in form, broad in outline and preliminary in nature. (Finding of Fact No. 32).

Accordingly, plaintiff's motion for a preliminary injunction based on alleged violations of Rule 10b-5 is denied. In the event the plaintiff asserts that the communication, which will be ultimately sent to the stockholders, itself violates the standards of disclosure incorporated in Rule 10b-5, the Court will rule on that question at the time it is presented and make any Order which appears appropriate at the time. Further, it should be noted in connection with the class action aspect of this case that the Court has ordered that a full disclosure be made in the communication to be sent to the RST stockholders of the pendency of this law suit, together with a full and fair disclosure of the relevant contentions of the parties. (*See* our Order, *infra*).

---

4. *See, e. g.*, Kahan v. Rosenstiel et al., 424 F.2d 161 (3rd Cir. 1970).

### (3) FAIRNESS OF THE REORGANIZATION

■ Plaintiff seeks a preliminary injunction against the proposed reorganization on the further ground that the reorganization is unfair to the non-AMAX shareholders of RST as a result of fraud and a breach of fiduciary duty by AMAX. It is clear that plaintiff's request for a preliminary injunction invokes our traditional equity powers and is addressed to our discretion. It is also clear that in order to grant a preliminary injunction we must find

(1) that there is a likelihood that movant will succeed in the ultimate action;

(2) that plaintiff will suffer irreparable harm if no preliminary injunction is granted; and

(3) that the harm to the plaintiff outweighs the injury the defendants might suffer as a result of granting the injunction.

For the reasons set out below, we have decided to deny plaintiff's motion for a preliminary injunction without prejudice.

We have concluded that the motion for a preliminary injunction on this ground is premature. The record reveals that the proposed reorganization will not occur in fact until and unless (a) the RST shareholders approve the reorganization by a ¾ vote [5] (Finding of Fact No. 34), and (b) the High Court of Zambia approves the reorganization, finding that it is equitable to all shareholders. (Finding of Fact No. 35). In addition, either AMAX or RST may exercise its option to terminate the agreement to reorganize under provision 11 of the Agreement in Principle (PX–9). In view of these circumstances, we believe that the time is not yet ripe for us to decide the issue presented. There are several reasons for our action, namely:

(1) because of what is yet to occur, there may be no reorganization at all or a reorganization in a form different than the plan presently before us; [6]

(2) in order to balance the equities in this case it would be significant to know whether and under what circumstances the shareholders of RST and the High Court of Zambia approved the proposed reorganization;

(3) until the RST shareholders and the Zambian Court approve the plan we do not think that plaintiff will suffer any injury, or certainly not an irreparable injury required for the granting of a preliminary injunction; and

(4) further, the granting of the preliminary injunction might well cause irreparable harm to the defendants since it would prevent them from communicating with the stockholders about a plan of reorganization which might ultimately be determined to be fair and reasonable. This well might make it virtually impossible for RST to consummate its agreement with the Zambian Government.

Accordingly, plaintiff's motion for a preliminary injunction on the ground that the proposed reorganization is unfair to the non-AMAX shareholders of RST and is a result of fraud and breach of fiduciary duty by AMAX will be denied without prejudice to plaintiff's renewal of said motion in accordance with this Opinion.

### (4) CLAYTON ACT

It is plaintiff's contention that if the proposed reorganization is effectuated it may result in a substantial lessening of competition in violation of Sections 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18, 19. Therefore, we are urged to

---

5. We also note that counsel for AMAX has assured us that the reorganization must also be approved by a majority of all non-AMAX shareholders. (*See* Footnote 2, *supra*).

6. For example the High Court of Zambia may approve the proposed reorganization conditioned on matters not presently in the defendants' plan.

grant injunctive relief under 15 U.S.C. § 26 [7] to block the proposed reorganization of RST and AMAX.

 In determining whether the requested injunctive relief should issue, we sit as a court in equity. So constituted, we are allowed broad discretion to consider and weigh the relevant facts. Employing these powers, we have concluded that at this time the motion for a preliminary injunction, founded on alleged violations of the anti-trust laws, must be denied. In reaching this result, we have been motivated by reasoning similar to that employed in our disposition of Issue (3), *supra*, to wit, given the fact that the proposed plan of reorganization has yet to be finally approved it would be premature for this Court to decide the question that, if and when approved, the reorganization will violate the Clayton Act. Indeed, the express language of 15 U.S.C. § 26 requires that, *inter alia*, before a preliminary injunction may issue, the plaintiff must show "that the danger of irreparable loss or damage is immediate." The very fact that the reorganization has yet to meet with stockholder approval and has yet to receive the imprimatur of the High Court of Zambia belies the "immediacy" of plaintiff's claim. Hence, we find that there is no evidence of any immediate irreparable loss or damage as relates to the anti-trust claims in this case.

Our denial of plaintiff's motion for a preliminary injunction, founded on alleged violations of the Clayton Act, will be without prejudice to their resubmission to this Court at an appropriate time. We should note that, if and when presented, the Court would expect that the record on the anti-trust issue will be considerably amplified on the question of potential anti-competitive effects of the proposed reorganization (assuming that the present plan, or one similar, is adopted) particularly in light of Defendant AMAX's arguments that (1) the actual commercial effect of the proposed reorganization will be a reduction in AMAX's present interest in RST's copper operations, and (2) assuming that the reorganization will result in an increase of AMAX's interest in the copper business, whether AMAX and RST are competitors " * * * in any line of commerce in any section of the country * * * " within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### III. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this action, venue is properly laid here, and the Court has personal jurisdiction over the defendants.

2. This action is properly maintainable as a class action under Rules 23(b) (1) (B) and 23(b) (3) of the Federal Rules of Civil Procedure. The class consists of all shareholders of RST, other than AMAX.

3. The March 6, 1970 joint statement of RST and AMAX, sent to all RST shareholders, contained no misstatements of, nor omissions to state, material facts in violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78, and Rule 10b–5, promulgated thereunder.

4. Plaintiff's motion for a preliminary injunction on the ground that the proposed reorganization is unfair to non-AMAX shareholders of RST as a result of AMAX's alleged fraud and breach of fiduciary duty is premature for the reasons outlined in our Opinion.

---

7. In pertinent part, this Section reads as follows: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue * * * "

5. The plaintiff's motion for a preliminary injunction, founded on alleged violations of Sections 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18, 19, is premature for the reasons outlined in our Opinion.

### ORDER

And now, this 8th day of June, 1970, it is ordered that:

(1) The Motion of defendant RST to dismiss the complaint as to it on the ground of lack of *in personam* jurisdiction be and the same is hereby denied;

(2) The Motion of plaintiff for a preliminary injunction be and the same is hereby denied without prejudice;

(3) This action may be maintained as a class action under Rules 23(b) (1) (B) and 23(b) (3) of the Federal Rules of Civil Procedure; the class consists of all shareholders of defendant RST other than defendant AMAX; under Rule 23(d) of the Federal Rules of Civil Procedure all members of the class shall be notified in the statement being drafted to inform stockholders of the proposed reorganization (See Finding of Fact No. 33) of

(a) the pendency of this litigation, the claims made by the plaintiff, the defenses put forward by the defendants, and the decision of the Court rendered this day at this stage of the litigation; and

(b) the opportunity of any member of the class to intervene in the action by notification to Harold Kohn, the named plaintiff, of his desire to intervene (Mr. Kohn may then make an appropriate motion to the Court); and

(c) the opportunity of any member to signify by notice to the Court whether he considers the named plaintiff to be an adequate and fair representative of the class in view of the different tax treatment he receives as compared with the treatment received by other general stockholders, or if for any other reason he considers the named plaintiff an inadequate representative of the class.

With respect to the form of this notification, counsel will submit to the Court for approval an agreed-upon form.

(4) The Motion of the Intervenors to Intervene as plaintiff-members of the class is granted.