Robert STAFFIN

v.

Joel W. GREENBERG et al.

Donald L. WINDERMAN

v.

Joel W. GREENBERG et al.

Bernard J. GOMBERG

v.

BLUEBIRD INCORPORATED et al.

Charles HEIT

v.

BLUEBIRD INCORPORATED et al.

Morris & Sally LEONARD

v.

Joel W. GREENBERG et al.

Civ. A. Nos. 79–3157, 3446, 3563, 3688 and 4034.

United States District Court, E. D. Pennsylvania, E. D.

Feb. 24, 1981.

Leonard Barrack, Barrack, Rodos & McMahon, Harold E. Kohn and Dianne M. Nast, Kohn, Savett, Marion & Graf, P. C., Robert J. LaRocca, Philadelphia, Pa., for plaintiff.

Marc P. Cherno, Fried, Frank, Harris, Schriver & Jacobson, New York City, for Northern Foods.

John W. Pelino, and David A. Gradwohl, Pelino & Lentz, Philadelphia, Pa., for Bluebird, Greenberg and Cook.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Defendant Bluebird, Incorporated ("Bluebird") is a Pennsylvania corporation with its principal place of business at Philadelphia and is one of the largest producers and packers of ham products in the United States. Bluebird was founded by the father of the defendant, Herbert Cook ("Cook"). Bluebird's common shares are registered with the Securities and Exchange Commission ("SEC") and are traded on the New York Stock Exchange and on other securities markets.

Plaintiffs allege that defendants violated various sections of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b–5 [1] promulgated by the SEC by failing to disclose material facts to Bluebird shareholders in connection with a tender offer Bluebird made from June 11 to July 6, 1979 to its shareholders for the purchase of 750,-000 shares of Bluebird at the price of $10.00 per share.

On February 27, 1980, I certified two classes of plaintiffs, pursuant to Fed.R. Civ.P. 23. Generally, the first class consists

---

1. Rule 10b–5 provides the following:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5 (1979).

of the owners of Bluebird common stock who sold their stock to Bluebird pursuant to the tender offer; the second class is those persons who sold shares of Bluebird common stock in the national securities markets during the period of May 29, 1979 to August 7, 1979. Presently before the court are defendants' joint motion for summary judgment pursuant to Fed.R.Civ.P. 56.[2] Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is available only when there are no material fact issues in the litigation. *Adickes v. S. H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The court, for purposes of determining a summary judgment motion, must view the record in the light most favorable to the party opposing the motion. *Id.* With these principles in mind, the following are the undisputed material facts as developed from the depositions, documents and pleadings submitted to the court.

## I. UNDISPUTED FACTS

From 1968 through March 27, 1979, Herbert Cook and his family owned or controlled between sixteen and twenty percent of the common stock of Bluebird, which was sufficient to give the Cook family control of the company. Herbert Cook was the Chairman of the Board of Directors and Chief Executive Officer of Bluebird. Defendant Joel W. Greenberg ("Greenberg"), a resident of Chicago, Illinois who regularly traded in the commodities markets, became a shareholder of Bluebird in 1973 by open market purchases of Bluebird stock. By June 26, 1978, Greenberg owned approximately nineteen percent of Bluebird's outstanding stock and advised Bluebird of his intention to acquire up to twenty-five per-

cent of the stock. Cook distrusted Greenberg. He feared that Greenberg would one day own a sufficient amount of shares to gain control of the company. Cook also did not like Greenberg's repeated demand that he be represented on Bluebird's Board of Directors and his suggestion that Bluebird actively trade in the commodities markets.

In May of 1978, representatives from the International Division of the investment banking firm of Paine, Webber, Jackson and Curtis ("Paine Webber") communicated with Bluebird for the purpose of determining whether Bluebird was interested in being acquired by or merged with another company. Paine Webber also contacted Greenberg concerning the sale of his stock and Greenberg indicated that his shares would be available at some premium over market value. Gregory M. McCrane, Managing Director of the International Division of Paine Webber, also spoke with defendant Northern Foods, Ltd. ("Northern"), a British corporation that had recently acquired a meat processing company, Pork Farms, Ltd. of Nottingham, England. Northern communicated to Paine Webber its interest in exploring the acquisition of a food company in the United States. Paine Webber then contacted Cook and Jacob J. Siegal ("Siegal"), the President of Bluebird, to arrange a meeting with representatives from Northern.

Northern's chairman, Nicholas Horsley ("Horsley"), and its finance director, John R. Clayton ("Clayton"), then visited the United States in August of 1978. While in America, they met with Cook and Siegal, the executives of seven other companies and representatives of four investment banks. Horsley was impressed with Bluebird's operations and with its management and concluded that Northern should consider Bluebird as an acquisition candidate.

Meanwhile, Greenberg continued his purchases of Bluebird stock and by February 9,

---

**2.** The defendants have also asked for dismissal of the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). Since the parties have submitted depositions, affidavits and other materials, I will treat the motion to dismiss as a Rule 56 motion. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

1979, he had increased his investment to more than thirty percent of the outstanding shares. Fearing Greenberg's imminent takeover of Bluebird, Cook arranged a telephone conference with some of Bluebird's Directors in early March, 1979. During this conference, the Board agreed that Greenberg's plans would be detrimental to their own positions and they, therefore, decided to seek a "White Knight", that is, a friendly company to acquire Bluebird on acceptable terms, which would thwart Greenberg's attempt to gain control of the company by continuing his open market purchases. As time passed, Cook lost hope in the Board of Directors' ability to find a "White Knight" in sufficient time to thwart Greenberg's takeover plans. Convinced that Greenberg would soon win control of Bluebird, Cook met with Greenberg in the middle of March, 1979 and proposed that Greenberg either agree to stop his purchases or, alternatively, that either Greenberg or Cook buy the other's shares. After considering Cook's proposal, Greenberg agreed on March 27, 1979 to buy Cook's shares and then negotiated an agreement whereby Greenberg bought all but one hundred of Cook's shares. As a result, Greenberg's percentage of ownership in Bluebird increased to more than forty-nine percent of the total outstanding shares of the company. As part of the agreement, Cook resigned from his positions as Chairman of the Board and Chief Executive Officer and entered into a two year consultation agreement with Bluebird. Jacob J. Siegal, Bluebird's President at the time of the sale, replaced Cook as Chairman of the Board and Chief Executive Officer.

Shortly after learning of Greenberg's purchase of Cook's shares, two members of the Board of Directors, John L. Vogelstein ("Vogelstein") and Steven B. Swensrud ("Swensrud") also offered to sell their shares to Greenberg. Greenberg rejected the offer but later agreed that Bluebird would be willing to buy their shares. Thereafter, upon advice of counsel and investment bankers, Bluebird proposed to make an offer to buy its own stock at $10.00 per share available to all shareholders by way of a tender offer for 750,000 shares. At this time, shares of common stock of Bluebird were selling on the New York Stock Exchange at approximately $9.50. It was agreed with Vogelstein and Swensrud that they would tender at least 380,000 shares of stock they controlled and that, in the event Bluebird did not complete the tender offer, Bluebird would still buy those shares for $10.00. On May 26, 1979, the tender offer was announced to be effective June 11, 1979.

In late April 1979, Christopher R. Haskins ("Haskins"), Deputy Chairman of Northern, and the Chief Executive Officer of Northern Pork Farms, Ltd., David C. Samworth, visited the United States and met briefly with Siegal, Cook and officials from twelve other companies. They told Cook that Northern would not be interested in acquiring Bluebird without Cook in charge. During this meeting, Cook agreed to act as a consultant for Northern in the United States by visiting Showell Farms, another United States company Northern was considering acquiring. At this time, Northern also discussed with Cook the possibility of Cook becoming affiliated with Northern if the company decided to invest in the United States.

In early June 1979, after visiting Showell Farms, Cook approached Greenberg and asked him to have Bluebird rehire him as Chairman and Chief Executive Officer of Bluebird. Cook wanted his old job back because he "was frustrated, bored and generally fed up with inactivity" (Cook affidavit ¶ 16). Greenberg agreed to have Cook reappointed to the Board of Directors of Bluebird as its Chairman and Chief Executive Officer.

On June 11, 1979, after Greenberg had agreed to reappoint Cook, Bluebird disseminated to its shareholders its tender offer circular offering to acquire 750,000 of its own shares of common stock at $10.00 per share. The tender offer originally was to expire on June 28, 1979. On June 20, 1979, after Cook had been formally reappointed Chairman and Chief Executive Officer of Bluebird, Cook called representatives of Northern to advise them of this develop-

ment. Upon learning of these facts, Northern suggested that there no longer appeared to be a need for Cook to meet with Northern in a planned trip to discuss a further business relationship between them since Cook, now back at Bluebird, would not be available for other business ventures. Cook vigorously responded that there might be a stronger reason for talking since Northern had previously expressed an interest in Bluebird with him in charge. Cook also told Northern that he believed Greenberg's shares of stock of Bluebird might be available for purchase.

On June 23, 1979, Bluebird disseminated to its public shareholders a supplement to its tender offer circular. The supplement stated that Cook had returned to Bluebird as Chairman and Chief Executive Officer and extended the tender offer to July 6, 1979. The supplement also disclosed that Swensrud, Vogelstein and Siegal intended to tender all of their shares, an event which would probably result in an oversubscription of the tender offer and a proration of the shares accepted by Bluebird. The tender offer was vastly oversubscribed with a majority of the shares being tendered by insiders. As a result, only 57.2% of the tendered shares were purchased, 60.5% of which were purchased from insiders.

During his planned visit to Northern's facilities in the United Kingdom on July 12–13, 1979, Cook, without the knowledge or authority of Greenberg or the Board of Directors, suggested to Northern representatives that they should consider the possibility of offering to purchase Bluebird for a price of around $65,000,000. They told Cook they would consider it and, if interested, contact him later in the month. On July 23, 1979, Nicholas Horsley, Northern's Chairman, called Cook, told him they would be interested in discussing the possibility of acquiring Bluebird, and asked him to inform Greenberg. On July 25, 1979, Cook met with Greenberg and told him Northern was interested in discussing the possibility of an acquisition of Bluebird. The record reveals that this was the first time Greenberg ever heard of Northern. On July 30, 1979, Greenberg told Cook he would be interested in meeting with Northern and dis-

cussing the matter. Cook then contacted officials of Northern and told them Greenberg was willing to meet, but price was an issue and he would not get involved in the price negotiations. Arrangements were made for representatives of Northern to meet with Greenberg and others in the middle of August, 1979 to discuss the possibility.

During the first week of August, 1979, the trading volume and the price of Bluebird common stock increased dramatically, indicating there may have been a leak concerning the upcoming discussions between Northern and Bluebird. Therefore, on August 7, 1979, Bluebird issued a press release disclosing that Bluebird was "conducting exploratory talks with an undisclosed purchaser concerning the sale of the Company . . . ."

The planned meeting for the middle of August was advanced, and discussions between representatives of Northern and Bluebird began August 8, 1979 and continued during the month. On August 24, 1979, Bluebird issued a press release announcing that Bluebird and Northern had reached an "agreement in principle," subject to a definite agreement to be negotiated and further subject to shareholder approval, to sell Bluebird to Northern at $14.875 per share. The press release also revealed that Greenberg, who then owned approximately fifty-seven percent of the outstanding stock of Bluebird, had given an irrevocable proxy to vote his shares with a majority of the votes cast by the other shareholders of Bluebird, whether for or against the transaction. Following extensive negotiations, a definitive agreement was reached on October 22, 1979.

On December 14, 1979, the shareholders of Bluebird approved the merger. On December 26, 1979, Northern negotiated with Paine Webber for services rendered in the amount of $200,000, to be paid upon actual consummation of the merger. On January 4, 1980, the acquisition was consummated, and all shares of Bluebird were converted into a right to receive $14.875 per share.

Five separate suits followed Bluebird's announcement of the merger agreement, all

of which have been consolidated before this court pursuant to Fed.R.Civ.P. 42. The plaintiffs filed suit against Bluebird, Herbert Cook, Joel Greenberg and Northern Foods, Ltd. Each of these defendants have moved for summary judgment on the merits of plaintiffs' allegations. In addition, Northern seeks dismissal under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. For the reasons set forth below, I will deny Northern's Rule 12(b)(2) motion for dismissal, but will grant its and the other defendants' Rule 56 motions for summary judgment.

## II. NORTHERN FOODS, LTD.

### A. *Personal Jurisdiction*

Northern Foods, Ltd. first asks for dismissal of the complaint on the ground that this court lacks personal jurisdiction over it. This court's personal jurisdiction over Northern is based upon section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1977). Rule 4(e) of the Federal Rules of Civil Procedure states the following: "Whenever a statute of the United States ... provides for service of a summons ... upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute..." Section 27 of the Exchange Act authorizes international service of process in suits brought to enforce the Act. *Securities and Exchange Commission v. Myers*, 285 F.Supp. 743, 748 (D.Md.1968). Section 27 states the following:

> Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and *process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.*

15 U.S.C. § 78aa (1977) (emphasis added).

Northern argues that assertion of personal jurisdiction over it under section 27 would violate due process of law guaranteed by the Fifth Amendment to the United States Constitution because it is alleged that Northern lacks sufficient contacts or ties with the United States "to make it reasonable and just according to our traditional conception of fair play and substantial justice" to subject Northern to this court's jurisdiction. *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945).

Northern concedes that when a federal court exercises jurisdiction pursuant to a federal statute it is the United States and not the particular state in which the court is located that is exercising jurisdiction and, therefore, all that is necessary to satisfy Due Process is that the defendant have minimum contacts with the United States. *Fitzsimmons v. Barton*, 589 F.2d 330, 332–34 (7th Cir. 1979); *Driver v. Helms*, 577 F.2d 147, 156–57 (1st Cir. 1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); *Mariash v. Morrill*, 496 F.2d 1138, 1142–43 (2d Cir. 1974); *Nelson v. Quimby Island Reclamation District*, 491 F.Supp. 1364, 1377–79 (N.D.Cal.1980); *Drexel Burnham Lambert, Inc. v. Fidelity Bond & Mortgage Co.*, C.A.No.79–4461, slip op. at 4–7 (E.D.Pa., filed October 1, 1980). Since Northern's activities are not so continuous and systematic that it may be said to be already "present" in the United States, Northern's "minimum contacts" must be purposeful, *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), and directly related to the plaintiffs' suit or cause of action. *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 413 (9th Cir. 1977); *VanNaarden v. Grassi*, 488 F.Supp. 720, 723 (E.D.Pa.1980).

When considering a motion to dismiss for lack of personal jurisdiction, a court must read the pleadings in the light most favorable to the plaintiff. *Empire Abrasive Equipment Corp. v. H. H. Watson, Inc.*, 567 F.2d 554, 557 (3d Cir. 1977); *VanNaarden v. Grassi*, 488 F.Supp. 720, 722 (E.D.Pa.1980). In their Consolidated

Amended Complaint ("Complaint"), which I ordered plaintiffs to file after the completion of discovery, plaintiffs alleged that Northern conspired with and "aided and abetted the other defendants in the commission of the illegal acts alleged in this complaint, by, *inter alia*, knowingly and substantially assisting for its own personal benefit and gain in the effectuation of the wrongful acts alleged which Northern knew were wrongful." Complaint ¶ 5.

■ Based on the record before me, I am persuaded that Northern has sufficient deliberate contacts with the United States that are related to the present cause of action so that this court may exercise personal jurisdiction without violating the due process clause of the Fifth Amendment. These contacts consisted of the following. On May 12, 1978, Nicholas Horsley, Chairman of the Board of Northern spoke via telephone with Gregory M. McCrane, Director of the International Division of Paine Webber in New York, about Northern acquiring Bluebird. On August 1, 1978, representatives of Northern met with Mr. McCrane and other officers of Paine Webber in New York City. On August 2, 1978, Horsley and John R. Clayton, Northern's finance director, traveled to Philadelphia to discuss the prospects of acquiring Bluebird with Cook and Siegal. On August 4, 1978, Horsley traveled to Chicago to inspect a Bluebird meat plant. Northern hired Cook as a consultant in May 1979 to advise it of the investment opportunities in the United States. On June 15, 1979, Cook and Horsley spoke about Northern's establishing a continuing business relationship with Cook. On July 23, 1979, Northern asked for Cook's help in acquiring Bluebird. On August 23, 1979, Bluebird and Northern finally reached agreement in principle that Northern would acquire Bluebird for $14.875 per share. On October 22, 1979, Northern and Bluebird executed an Agreement and Plan of Merger, by which Northern consented to jurisdiction of the federal courts located in Pennsylvania for all controversies arising from the merger.

The above facts are sufficient to justify this court's exercise of personal jurisdiction over Northern. *See Alco Standard Corp. v. Benalal*, 345 F.Supp. 14, 24–25 (E.D.Pa. 1972); *Kohn v. American Metal Climax, Inc.*, 313 F.Supp. 1251, 1259–60 (E.D.Pa. 1970). Accordingly, Northern's motion to dismiss for lack of *in personam* jurisdiction must be denied.

Northern next asks this court for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, summary judgment will be granted in Northern's favor.

B. *Northern's Duty of Disclosure*

■ Northern is named only in Count II of plaintiffs' complaint. This count alleges that all of the defendants violated section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder by failing to disclose a variety of alleged material facts in connection with Bluebird's tender offer for its own shares. It is well established, however, that before any liability may arise for nondisclosure under these provisions some relationship must exist between the plaintiff and defendant which imposes a duty upon the defendant to disclose material information to the plaintiff in connection with his purchases or sale of a security. *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The mere possession and nondisclosure of material facts does not confer liability under these rules. In *Chiarella* the Court held that liability under section 10(b) and Rule 10b–5 for failure to disclose material information can be imposed only when the party having the information has a duty to disclose it to the plaintiff "because of a fiduciary or similar relation of trust and confidence between them." *Id.* at 228, 100 S.Ct. at 1114 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).

In *Chiarella*, the Court also noted with approval a decision of the Court of Appeals for the Second Circuit which held that a potential purchaser of a corporation's stock in a tender offer or similar transaction has no duty to disclose his acquisition plans prior to his purchase of the stock. The Court stated the following:

The Court of Appeals for the Second Circuit previously held, in a manner consistent with our analysis here, that a tender offeror does not violate § 10(b) when it makes preannouncement purchases precisely because there is no relationship between the offeror and the seller:

"We know of no rule of law ... that a purchaser of stock, who was not an 'insider' and had no fiduciary relation to a prospective seller, had any obligation to reveal circumstances that might raise a seller's demands and thus abort the sale." *General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159, 164 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).

*Id.* 445 U.S. at 232 n.14, 100 S.Ct. at 1116. *See also id.* 445 U.S. at 229, 100 S.Ct. at 1115; *Feldman v. Simkins Industries, Inc.*, 492 F.Supp. 839, 844–45 (N.D.Cal.1980); *Rothschild v. Teledyne, Inc.*, 328 F.Supp. 1054, 1056–57 (N.D.Ill.1971). There are important policy considerations that support the decision not to impose a duty upon a purchaser of stock who is neither an insider nor a fiduciary to reveal his intentions before actually purchasing the stock. One leading authority has articulated these justifications as follows:

Notwithstanding its characterization as "information," the assemblage and the resulting investment decision, at least in the hands of the person generating it, (albeit not in the hands of those who receive it from him for nontrading purposes) is like the "information" that he intends to buy or sell securities at a given time at a particular price or prices. He is not obligated to disclose that "information" or to refrain from dealing.

. . . .

In all such transactions the transactor's advantage is the result of his knowledge of his unilateral decision to buy or sell stock at a later time. To trammel his freedom to buy at a later time by requiring disclosure in advance will deprive him of the opportunity to profit from that decision solely because he alone knows of the decision in advance. The only unerodable advantage that the transactor has over the public is his knowledge that he intends to transact at a particular price, or at any rate at prices that may differ from the current market price and that would alter that market price if known publicly. But that advantage, unerodable though it be, is endemic to our exchange system, and no more validly requires disclosure to others than does the advantage of any negotiator who knows that he is willing to pay more or accept less than he has announced during the course of negotiations. . . . Nothing in the theory or language of the antifraud provisions of the securities laws requires denial of that kind of informational advantage in the absence of other reasons for denying it.

Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv.L.Rev. 322, 361–62 (1979) (footnotes omitted).

■ The record reveals that Northern was not an insider nor in a confidential or fiduciary relationship with the plaintiffs in this action; therefore, Northern was under no affirmative duty of disclosure to Bluebird shareholders. Since this is the case, Northern cannot be liable under section 10(b) of the Exchange Act or Rule 10b–5 promulgated thereunder by the SEC.

### C. *The Conspiracy and Aiding and Abetting Allegations*

■ The affidavits, depositions and pleadings do not support plaintiffs' allegations that Northern conspired with or aided and abetted the other defendants. I therefore will grant Northern's motion for summary judgment on these allegations.

■ In order to establish liability for aiding and abetting a securities violation, the plaintiff has the burden of proving: "(1) that there has been a commission of a wrongful act—an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing." *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied sub nom.*, 99

S.Ct. 318, 58 L.Ed.2d 323; *Keller v. Coyle,* 499 F.Supp. 1031, 1033 (E.D.Pa.1980).

Assuming for the purposes of Northern's motion that Bluebird, Cook and Greenberg violated section 10(b) or Rule 10b–5 and defrauded the plaintiffs, I must nevertheless conclude that the second and third elements listed above as prerequisites for aider and abettor liability are not present as to Northern in this record. The uncontroverted fact is that Northern did not even know of Bluebird's self-tender until after it was completed, so that Northern could not possibly have knowingly aided in any concealment of information to tendering shareholders of Bluebird (Horsley deposition pp. 38–39; Haskins deposition pp. 26–27; Cook deposition pp. 215–216). Accordingly, Northern's motion for summary judgment as to the aiding and abetting allegations must be granted.

■ Summary judgment must also be granted to Northern with respect to the conspiracy charge against it. The elements of a section 10(b) or Rule 10b–5 conspiracy that have to be proved to establish a prima facie case have not yet been uniformly defined by the courts. 3 A. Bromberg & L. Lowenfels, Securities Fraud & Commodities Fraud § 8.5(597) at 208.56 (1979). However, all courts agree that knowledge of the wrongful act is an indispensible element of a conspiracy charge under section 10(b) and Rule 10b–5. *Id.* at § 8.5(582) at 208.43. *E. g., Fry v. Schumaker,* 83 F.Supp. 476, 478 (E.D.Pa.1947). Since Northern had no knowledge of Bluebird's self-tender until after it was completed, its motion for summary judgment as to the conspiracy claim must be granted.

For all of the above reasons, summary judgment will be granted to Northern as to all the claims brought by the plaintiffs against it.

### III. BLUEBIRD, COOK AND GREENBERG

#### A. *Count I of the Complaint—Failure to Disclose*

■ I must next consider the summary judgment motions of the remaining defendants, Bluebird, Cook and Greenberg. In Count I of the complaint, plaintiffs allege defendants violated sections 10(b)[3] and 14(e)[4] of the Exchange Act and SEC Rule 10b–5[5] by failing to disclose certain facts that plaintiffs claim are material. The plaintiffs argue that a court can never grant summary judgment on the issue of the materiality of alleged nondisclosures in a securities case because the question of materiality is one of mixed law and fact. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). I must reject this argument. Although a determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," *id.,* nonetheless, summary judgment should be granted when "reasonable minds cannot differ on the question of materiality." *Id.*

---

**3.** Section 10(b) provides as follows:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of the facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (1977).

**4.** Section 14(e) provides as follows:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e) (1977).

**5.** See note 1 *supra.*

at 450, 96 S.Ct. at 2132 (quoting *John Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 1623, 40 L.Ed.2d 118 (1974)); *Gould v. American Hawaiian S.S. Co.*, 535 F.2d 761, 771 (3d Cir. 1976); *Gans v. Filmways, Inc.*, 453 F.Supp. 1116, 1119 (E.D.Pa.1978), *aff'd mem.*, 595 F.2d 1212 (3d Cir. 1979). To deny a defendant in a securities case alleging nondisclosure of material facts the benefit of summary judgment procedures would cause a wholly innocent person to incur enormous legal expenses in defending an unmeritorious and frivolous lawsuit at trial. Such a result cannot be countenanced by our judicial system. I will, therefore, examine each of plaintiffs' contentions to determine whether there can be a reasonable difference of opinion on materiality.

First, plaintiffs claim that defendants have failed to disclose before Bluebird's self-tender that prior to March of 1979, Cook and Greenberg had been engaged in a struggle for control of Bluebird; that the Bluebird Board of Directors planned to acquire a "White Knight" to thwart Greenberg's acquisition plans; and that in March 1979, Cook agreed to sell his Bluebird stock to Greenberg. Complaint ¶ 15(a)(1)–(8)(b) and (c).

█  Under sections 10(b), 14(e) or Rule 10b–5, misinformation by misrepresentation or omission is not by itself sufficient to impose liability; the information must be material. *Healey v. Catalyst Recovery of Pa., Inc.*, 616 F.2d 641, 647 (3d Cir. 1980). The Supreme Court has defined materiality as: "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[6] The Court established a narrow definition of materiality because

**6.** Although the Supreme Court in *Northway* defined "materiality" in the context of an alleged proxy statement in violation of SEC Rule 14a–9 the same definition applies equally to

[t]he potential liability for a . . . violation can be great indeed, and if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fears of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decision-making.

*Id.* at 448–49, 96 S.Ct. at 2131–32.

█  In the instant case, the acquisition by Greenberg of Cook's stock was fully detailed in the press releases issued by Bluebird at the time of that acquisition, (See Bluebird News Releases, 3/27/79, 4/5/79), and Greenberg's position as controlling majority shareholder of Bluebird was fully disclosed in the tender offer materials. (Bluebird Offering Circular, p. 5; Supplement to Offer, p. 2). It is my judgment that reasonable minds cannot differ on the materiality of these alleged nondisclosures. There was no "substantial likelihood" that the detailed history of how Greenberg attained control of Bluebird "would have assumed actual significance in the deliberations of the reasonable shareholder" considering whether to tender his shares, *id.* 426 U.S. at 449, 96 S.Ct. at 2132, and therefore these facts did not have to be disclosed in the tender offer materials.

Other alleged nondisclosures deal with Cook's supposed attitude and thoughts about Greenberg, a possible Northern acquisition of Bluebird, and the fair value of Bluebird common stock at the time of the tender offer. Complaint ¶ 15(d), (e), (j). The Third Circuit Court of Appeals, however, has held that a corporate officer's subjective thoughts or ideas are not material so as to require disclosure. *Harnett v. Ryan Homes, Inc.*, 496 F.2d 832 (3d Cir. 1974). In *Harnett* the court stated:

determinations of materiality under the antifraud provisions of the federal securities laws. *Healey v. Catalyst Recovery of Pa., Inc.*, 616 F.2d 641, 647 (3d Cir. 1980).

In the corporate world, as elsewhere, the initial ruminations of executives must complete a circuitous course before becoming, if ever, actuality. Further, if we were to require corporate officers to disclose inchoate ideas, musings as it were, on matters that relate to the value of their companies' stock, few stock transactions in which they participate would avoid the possible charge of a Rule 10b-5 violation.

*Id.* at 838. The defendants therefore did not violate the securities acts by failing to disclose this information.

Paragraph 15(f), (g), (b), (q), (s) of Count I of the complaint alleged violations of the Exchange Act because defendants failed to disclose in their tender offer materials their contacts with Northern and their interest in a possible merger between Bluebird and Northern. It is well established that mere inquiries, preliminary discussions or communications preparatory to a possible acquisition of one company by another do not require disclosure under sections 10(b), 14(e) or 10b-5, but that disclosure is required only when there are firm offers for acquisition, or an acquisition seems reasonably assured at a time when the target corporation or its insiders are purchasing shares from its shareholders. *Missouri Portland Cement Co. v. H.K. Porter Co.*, 535 F.2d 388, 398 (8th Cir. 1976); *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1084–86 (5th Cir. 1970); *Bucher v. Shumway*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,142 (S.D.N.Y. 1979), *aff'd mem.*, 622 F.2d 572 (2d Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1318 (W.D.Mich.1978); *Crane Co. v. Anaconda Co.*, 411 F.Supp. 1208, 1210 (S.D.N.Y.1975); *Scott v. Multi-Amp Corp.*, 386 F.Supp. 44, 65 (D.N.J.1974). The reason such matters are not material and need not be disclosed is because public disclosure of tentative, indefinite, and contingent facts would itself be misleading. *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1084–85 (5th Cir. 1970).

The undisputed facts are that there was no agreement for acquisition, no offer to purchase, and no negotiation between Northern and Bluebird at the time of the self-tender. Plaintiffs' complaint does not even allege that there was a firm offer or a reasonably assured agreement. The record reveals that Northern had not expressed directly to Bluebird an interest in discussing a possible acquisition of Bluebird prior to the consummation of the self-tender and, again, the complaint does not allege that it had. I therefore hold that the defendants have not violated the securities laws by failing to disclose their contacts with Northern and their interest in a possible merger between Bluebird and Northern.

The next set of alleged nondisclosed facts concerns Cook's discussions with Northern during this period about his doing consulting work for Northern. Complaint ¶ 15(h), (i). Reasonable minds cannot differ on the materiality of this information. Cook's consulting discussions with Northern during this period had nothing whatever to do with Bluebird, and in any case, no compensation was ever paid by Northern to Cook for his examination of the two American companies which Northern was considering acquiring at the time. Even if Cook's consultation with Northern was of importance to the plaintiffs at one time, it was made inconsequential when Cook returned to Bluebird, as fully discussed in the tender offer documents. (Supplement to Bluebird Offering Circular, p. 2). I therefore hold that this fact cannot be considered material information that Cook was required to disclose to Bluebird's shareholders.

In paragraph 15(k) of the complaint, plaintiffs allege that defendants "failed to disclose that prior to his return as Chairman and Chief Executive Officer of Bluebird, Cook told Greenberg that he would be able to find a buyer for Greenberg's shares of Bluebird at a substantial profit." This averment has been categorically denied by the defendants (Greenberg deposition at 127–28; affidavit ¶ 4; Cook deposition at 230; affidavit ¶ 17), and plaintiffs have submitted no evidence whatsoever to sup-

port this bald allegation. I therefore will not speculate on whether this fact would have to be disclosed to shareholders if it indeed had been true.[7]

In paragraph 15(m) of the complaint, plaintiffs contend that defendants "failed to disclose that dramatic improvement in Bluebird's sales and earnings were [sic] anticipated during the class period due to the favorable hog cycle and that Bluebird's stock in the market was grossly undervalued." It is well established that speculative information regarding future prospects, especially a projection on future earnings, is not material and need not be disclosed and in many cases may itself be misleading. *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221–22 (9th Cir. 1980); *Dower v. Mosser Industries, Inc.*, 488 F.Supp. 1328, 1338–39 (E.D.Pa.1980); *Cf. Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). ("Ordinarily the SEC and the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data in proxy materials.") I therefore hold that defendants did not violate the securities acts by failing to disclose this information.

Paragraph 15(r) of the complaint alleges that defendants failed to state the "true" value of Bluebird stock. This allegation even if correct is insufficient to establish liability under the federal securities laws. In *Bucher v. Shumway*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,142 (S.D.N.Y.1979), *aff'd mem.*, 622 F.2d 572 (2d Cir. 1980), *cert. denied*, — U.S. ——, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980), the plaintiff alleged that the failure to disclose that the price offered by an issuer in a self-tender situation was below the true value of its shares. The court held that this allegation does not form a basis for liability under sections 10(b), 14(e) or SEC Rule 10b–5. *Id.* at 96,301. I agree with the *Bucher* court that a claim of fail-

ure to disclose that the transaction price was unfair does not state a claim under the federal securities laws. *Accord, Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1084 (2d Cir. 1977).

In subparagraph 15(n) of the complaint, it is alleged that defendants misrepresented to plaintiffs the agreement between Bluebird and Vogelstein and Swensrud by failing to disclose that prior to engaging the services of an investment banker to evaluate the terms of the proposed tender, Bluebird had agreed to purchase at least 380,000 shares of Bluebird common stock from Vogelstein and Swensrud regardless of whether or not Bluebird made the offer available to the public shareholders.

Subparagraph 15(n) is contrary to the undisputed facts. The record reveals Vogelstein and Swensrud, Directors of Bluebird, did not enter into their agreements to sell some of their stock to the company until May 29, 1979. (Bluebird Offering Circular, p. 6). Jacob J. Siegal, the architect of the tender offer, testified at his deposition without contradiction that he first approached the investment banking firm, Wertheim & Co., with the idea of a tender offer on May 8, 1979, prior to the agreement with Vogelstein and Swensrud (Siegal deposition pp. 120–21). Thus, there is no factual basis for plaintiffs' claimed misrepresentation of the sequence of events.

Even if the plaintiffs are correct in contending that the investment firm was engaged after the agreement was executed, no material fact would have been misrepresented. The principal purpose of the tender offer, as disclosed, was to provide a way for Vogelstein and Swensrud to reduce or liquidate their Bluebird holdings (Supplement to Offer at 3). As was also disclosed, the investment bank was engaged only to give an opinion as to whether the tender offer was an imprudent use of corporate funds from the point of view of the remaining shareholders. *Id.* It was disclosed that the

---

7. In the face of a motion for summary judgment supported by affidavits and depositions, plaintiffs cannot rely on the naked allegations of their complaint. Rather, they must come forth with facts supported by affidavits or references to the record developed during discovery. Fed.R.Civ.P. 56(e); *Denckla v. Maes*, 313 F.Supp. 515, 524–25 (E.D.Pa.1970).

agreements with Swensrud and Vogelstein bound them to sell, and Bluebird to buy, portions of their stock at the $10.00 price, if no tender offer occurred (Bluebird Offering Circular, p. 6). It is my opinion that reasonable minds could not differ as to the materiality of the sequence of these events. There is no substantial likelihood that a reasonable shareholder would consider the timing of the engagement of an investment firm for the purpose of determining the prudence of the tender offer to be of any significance.

Subparagraphs 15(o) and (p) of the complaint deal with alleged nondisclosures relating to the tender offer price of $10.00 per share. The tender offer documents contained information disclosing the history of the market price per share over the three preceding years (Offering Circular p. 4) and explicitly stated that Bluebird was making no evaluation of the fairness of the price. Bluebird's Offer to Purchase provided the following:

> Although the Board of Directors has determined that the Offer would not be an imprudent use of Company funds, the members of the *Board of Directors have made no evaluation as to the fairness of this offering insofar as tendering shareholders are concerned.* Although management is optimistic about the future of the company, the price of the Common Shares may either be higher or lower than $10.00 per share in the future, depending upon the Company's progress and other factors affecting the securities markets.

Bluebird's Supplement to Offer to Purchase at 4 (emphasis added). *See also* Bluebird Offering Circular at 1. The shareholders were also informed that Cook had sold, and Greenberg had purchased, shares at $12.50 just over two months prior to the tender offer (Bluebird's Offering Circular at 5).

On the basis of these uncontroverted facts and their full disclosure, plaintiffs' allegations concerning price are without merit. There is no requirement that Bluebird make or disclose a prediction about the market price of their stock or its earnings.

*Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221–22 (9th Cir. 1980); *Dower v. Mosser Industries, Inc.,* 488 F.Supp. 1328, 1338–39 (E.D.Pa.1980). Moreover, it is clear that the insiders thought the tender offer price was fair, because Vogelstein, Swensrud and Siegal tendered all of their shares (Bluebird's Supplement to Offer to Purchase at 3). In addition, Seymour Saslow, Cook's accountant and Bluebird's internal auditor, tendered 1,000 shares of Bluebird during the tender offer (Saslow deposition at 59).

### B. *Count II of the Complaint—Failure to Disclose*

In Count II plaintiffs alleged that all the defendants violated section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder by failing to make the disclosures alleged in paragraph 15 of the complaint in addition to failing "to disclose that they were actively negotiating the acquisition of Bluebird by Northern . . . ." For the reasons set forth in the above discussion regarding Count I of the amended complaint, I grant all of the defendants' motions for summary judgment as to the allegations set forth in Count II.

### C. *Count III of the Complaint—Section 18(a) Claim For False and Misleading Statements of Material Fact*

■ Count III of the complaint charges that defendants Bluebird, Cook and Greenberg violated section 18(a) of the Exchange Act. Section 18(a) imposes liability for false and misleading statements of material fact in documents, reports or applications *required to be filed* with the Securities and Exchange Commission under the Exchange Act of 1934. *Dorfman v. First Boston Corp.,* 336 F.Supp. 1089, 1097–98 (E.D.Pa. 1972). This section provides:

> Any person who shall make or cause to be made any statement *in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder* or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in

the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.

15 U.S.C. § 78r (1977) (emphasis added).

Plaintiffs claim that the tender offer circular and supplement thereto, disseminated to shareholders on June 11, 1979, and June 23, 1979, were filed with the SEC pursuant to section 14 of the Exchange Act and therefore defendants can be liable under section 18(a) if the tender offer materials were false and misleading with respect to material facts.

Although section 14(d) of the Exchange Act generally requires tender offerors to file certain information with the SEC, section 14(d)(8)(B) specifically exempts issuers from the filing requirement:

The provisions of this subsection shall not apply to any offer for, or request or invitation for tenders of, any security . . .

B) by the issuer of such security. . . .

15 U.S.C. § 78n(d)(8)(B) (1977).

Since there was no statutory requirement to file the tender offer documents with the SEC, Bluebird did not file them. Affidavit of John I. MacKerell ¶ 5. Accordingly, plaintiffs have no section 18 claim against Bluebird and the other defendants since Bluebird did not file the tender offer materials that plaintiffs claims were misleading and deceptive with the SEC. Such filing is a prerequisite for section 18(a) liability. *Russell v. Travel Concepts Corp.*, [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,230 (M.D.Tenn.1975); *Dorfman v. First Boston Corp.*, 336 F.Supp. 1089, 1097–98 (E.D.Pa.1972). Thus, plaintiffs' claim under section 18(a) is without merit, and defendants' motion for summary judgment as to Count III is granted.

**D. *Count IV of the Complaint—Section 16(b) Claim Against Greenberg***

In Count IV, plaintiffs only name Greenberg as a defendant, alleging that he violated section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b) (1977), prohibiting insiders from obtaining short swing profits in securities actions. Plaintiffs contend that Greenberg on seven different dates between March 5 and May 15, 1979, while already owning more than ten percent of the common stock of Bluebird, purchased an additional 1,055,089 shares of the company and that within six months after these purchase dates on August 23, 1979, he sold his shares to Northern and that this constitutes a violation of section 16(b). Section 16(b) provides the following:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him *from any purchase and sale, or any sale and purchase,* of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the *issuer,* irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. *Suit to recover such profit may be instituted* at law or in equity in any court of competent jurisdiction *by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request* or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both

at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

15 U.S.C. § 78p(b) (1977) (emphasis added).

■ Defendant Greenberg is entitled to summary judgment on Count IV as plaintiffs have no standing to prosecute a claim for violation of section 16(b) since the law requires that to maintain a derivative action under section 16(b) a plaintiff must have and maintain his standing as a shareholder at the commencement of the law suit and throughout the litigation. *Portnoy v. Kawecki Berylco Industries, Inc.,* 607 F.2d 765 (7th Cir. 1979); *Rothenberg v. United Brands Co.* [1977–78 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 96,045 (S.D.N.Y.), *aff'd mem.,* 573 F.2d 1295 (2d Cir. 1977). In *Rothenberg,* the Court held as follows:

> [T]o maintain a derivative action in the right of a corporation, plaintiff must have and maintain his standing as a shareholder throughout the litigation. While no § 16(b) case expressly so holds, this requirement is implicit in the nature of an action brought in the name of the corporation, where the recovery, if any, will inure to the benefit of the corporation.
>
> . . . .
>
> Here we hold only that the requirement of § 16(b) that the plaintiff be the owner of any security of the issuer is not satisfied where plaintiff loses his security owner status and thus any proprietary interest in the issuer during the pendency of the action.
>
> . . . .
>
> To permit former shareholders to sue under § 16(b) is not required by the statute. Such a practice if followed would allow persons with no continuing financial interest in the outcome of litigation to constitute themselves recipients of letters of marque and reprisal.

*Id.* at 91,691–92.

Following completion of the merger on January 4, 1980, none of the plaintiffs held any Bluebird securities. The purported class relative to this Count IV is defined as "all persons . . . whose shares of common stock of Bluebird were converted into a right to receive $14.875 per share pursuant to the Agreement and Plan of Merger." Complaint ¶ 34(b). Since plaintiffs have lost their status as shareholders of Bluebird, they lack standing to maintain a derivative action pursuant to section 16(b).

■ Even if plaintiffs have standing, no action can be brought under section 16(b) because there was no "sale" by Greenberg of his shares on August 23, 1979 as is alleged by the plaintiffs. The dispositive question in determining Greenberg's section 16(b) liability is when did Greenberg become irrevocably bound to sell his shares to Northern's subsidiary? *Champion Home Builders Co. v. Jeffress,* 490 F.2d 611, 616 (6th Cir.), *cert. denied sub nom., Jeffress v. Kramer,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974); *Lewis v. Musham* [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,802, at 90,-016 (S.D.N.Y.1980).

I find that Greenberg's commitment to sell his shares was not irrevocably fixed on August 23, 1979 and did not become so until at least December 14, 1979,[8] the date Bluebird's shareholders approved the Agreement and Plan of Merger between Bluebird and Northern. Because Greenberg had not become irrevocably bound to sell his shares until at least this time, more than six months had elapsed between Greenberg's last purchase of Bluebird's shares on May 15, 1979 and his sale of these shares to Northern's subsidiary. Therefore, plaintiffs section 16(b) claim fails. Summary judg-

---

**8.** Greenberg argues that he was not irrevocably bound to sell his shares to Northern's subsidiary until January 4, 1980, at which time the merger between Bluebird and Northern became effective. I express no opinion on the exact date when Greenberg became irrevocably committed to sell his shares; however, I do hold for purposes of this summary judgment motion that Greenberg was not irrevocably committed to sell his shares to Northern prior to December 14, 1979.

ment on Count IV will be granted in favor of Greenberg.

## IV. CONCLUSION

For all of the above reasons, Northern's motion for dismissal for lack of personal jurisdiction is denied. Northern's motion for summary judgment is granted. The motions for summary judgment filed on behalf of the defendants Bluebird, Cook and Greenberg are also granted.