Robert STAFFIN, Appellant,

v.

Joel W. GREENBERG, Bluebird, Incorporated, Herbert Cook and Northern Foods, Ltd., Appellees.

Donald L. WINDERMAN, Appellant,

v.

Joel W. GREENBERG, et al., Appellees.

Robert STAFFIN, et al., Appellees,

v.

NORTHERN FOODS, LTD., Appellant.

Bernard J. GOMBERG, Appellant,

v.

BLUEBIRD, INCORPORATED, et al., Appellees.

Charles HEIT, Appellant,

v.

BLUEBIRD, INCORPORATED, Appellee.

Morris and Sally LEONARD, Appellants,

v.

Joel W. GREENBERG, et al., Appellees.

Nos. 81–1665 to 81–1670.

United States Court of Appeals, Third Circuit.

Argued Nov. 16, 1981.

Decided Feb. 19, 1982.

As Amended March 22, 1982.

Barrack Rodos & McMahon, Leonard Barrack (argued), Philadelphia, Pa., for appellant Robert Staffin.

Kohn, Savett, Marion & Graf, P. C., Robert LaRocca (argued), Philadelphia, Pa., for appellant Donald L. Winderman.

Berger & Montague, P. C., Philadelphia, Pa., for appellant Bernard J. Gomberg.

Wolf, Popper, Ross, Wolf & Jones, New York City, for appellant Charles Heit.

Meredith & Cohen, Philadelphia, Pa., for appellants Morris and Sally Leonard.

Marc P. Cherno (argued), Stephen D. Alexander, Fried, Frank, Harris, Shriver & Jacobson, New York City, Alexander Kerr, Hunt, Kerr, Bloom & Hitchner, Philadelphia, Pa., for appellee and cross-appellant Northern Foods, Ltd.

John W. Pelino (argued), David A. Gradwohl, Pelino & Lentz, P. C., Philadelphia, Pa., Sheldon I. Saitlin, Shefsky, Saitlin & Froelich, Ltd., Chicago, Ill., for appellees Joel W. Greenberg, Herbert Cook and Bluebird, Inc.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and McCUNE,* District Judge.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

"Buy low, sell high" is good advice for any investor, but, unfortunately, this oft-repeated adage does not advise the investor as to what day or month the stock will be at its highest peak. This is an action by disappointed shareholders of Bluebird, Incorporated, who sold stock to their company at $10.00 per share in July, 1979, only to see their company agree to merge with another company, at $15.00 per share, in August, 1979. After the completion of discovery, the district court, in an exhaustive opinion, granted summary judgment in favor of all of the corporate and individual defendants. *Staffin v. Greenberg,* 509 F.Supp. 825 (E.D. Pa.1981). The plaintiffs appealed, and we will affirm.

### I.

*Facts.*

There are no material facts in dispute, and we state them, as required by Rule 56, F.R.Civ.P., in the light most favorable to the plaintiffs. We have given the plaintiffs the benefit of every inference that a reasonable fact-finder could draw from the record evidence, and many of the facts that follow are actually inferences that the plaintiffs have properly insisted we draw in reviewing the district court's grant of summary judgment.

Bluebird, Incorporated, is one of the largest producers of hams and ham products in the United States. Its headquarters are in Philadelphia, Pennsylvania, and in 1979 its sales were approximately $573,000,000.00. From 1968 to March of 1979, defendant Herbert Cook and his family controlled between sixteen and twenty percent of Bluebird's stock, which was sufficient to give the family effective control of the company. Cook was Bluebird's Chairman of the Board and Chief Executive Officer.

Joel W. Greenberg, a commodities trader from Chicago, began to purchase Bluebird stock in 1973. He continued his purchases through 1977, and in that year he first requested representation on Bluebird's Board of Directors. Cook did not like or trust Greenberg, and he rebuffed each of Greenberg's requests for Board representation.

Greenberg continued his open market purchases, and on February 15, 1979, he advised Bluebird that future purchases could have the effect of delisting the stock from the New York Stock Exchange, on which Bluebird common stock was traded. At that time Greenberg filed with the S.E.C. a Schedule 13D statement[1] which revealed his intention to continue his purchases. On March 9, 1979, Greenberg filed an amendment to his Schedule 13D statement by which he advised Bluebird that he intended to file a notification with the Federal Trade Commission and the Antitrust Division of the Department of Justice pursuant to the pre-merger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub.L. 94–435, Title II, § 201, 90 Stat. 1390, 15 U.S.C. § 18a.

Certain members of Bluebird's Board of Directors were extremely upset by Green-

---

* Honorable Barron P. McCune, United States District Judge, for the Western District of Pennsylvania, sitting by designation.

1. A Schedule 13D statement is a disclosure statement that must be filed with the S.E.C. by open-market purchasers of large numbers of shares of stock in a single company. The state-

ment is required by Section 13(d) of the Securities Exchange Act of 1934, Act of June 6, 1934, 48 Stat. 881, *as amended,* Pub.L. 90–439, 82 Stat. 454 (1968), 15 U.S.C. § 78m(d), (hereafter, the Act), and S.E.C. Rule 13(d)(1), 17 C.F.R. § 240.13d–1 (1981), promulgated thereunder.

berg's activities, and decided, in response to Greenberg's March 7 Schedule 13D supplement, to seek a "white knight," that is, a friendly merger partner who would save the company from control by Greenberg. The feeling among the directors, especially Cook, was that Greenberg was simply a "marauder," a speculator in commodities who did not have the company's best interests at heart.

One of the potential "white knights" that Board members considered was defendant Northern Foods, Ltd., a British food products company. Northern and Bluebird had discussed Northern's acquiring Bluebird as early as May, 1978. The investment banking firm of Paine, Webber, Jackson & Curtis assisted in those early discussions, and Northern agreed to pay Paine, Webber a fee if the merger were concluded. Nicholas Horsley, Northern's chairman, met with Cook in August, 1978 and was impressed by Cook and Bluebird. Northern, which was considering a number of candidates for acquisition in Europe and the United States, kept Bluebird in mind as a good merger possibility. After the decision to seek a "white knight" was made by Bluebird in early March, 1979, Jacob Siegal of Bluebird called Northern to see if Northern were interested in being a candidate for knighthood. Northern was indeed still interested in talking with Bluebird, but Northern's management was unwilling to advance their planned visit to the United States, then scheduled for May, 1979.

Events occurred quickly after March 7. Cook talked with John L. Vogelstein, a member of the Board, who suggested that if Greenberg offered "a deal that we can't turn down" that he, Vogelstein, might sell to Greenberg. Cook, fearing that a "white knight" might not be found in time, called Greenberg to arrange a meeting. At that meeting on March 12, 1979, Cook told Greenberg that he did not want to work for him. He also told Greenberg that Greenberg should either stop his purchases or either Cook or Greenberg should buy the other's shares. Greenberg chose to buy Cook's shares. On March 27, 1979, Cook and Greenberg signed an agreement under which Greenberg bought all but one hundred of Cook's shares, for $12.50 per share. Neither the shareholders nor the Board of Directors were told about the sale until after it had occurred. Bluebird issued press releases disclosing the sale immediately after it was concluded.

Vogelstein and Steven B. Swensrud, also a Bluebird director, owned or controlled 517,000 and 240,000 shares, respectively. They were angry at Cook for selling to Greenberg without notifying them in advance, and when they tried to sell to Greenberg on similar terms, Greenberg refused to buy. Greenberg, however, began to consider the possibility of Bluebird's buying their shares, and that possibility eventually ripened into a tender offer. Upon advice of counsel, Bluebird decided to offer to buy 750,000 of its own shares from its shareholders, at $10.00 per share, to facilitate the liquidation of the holdings of Swensrud and Vogelstein.

Meanwhile, Cook left the company and agreed to perform consulting services for defendant Northern. Cook continued to serve as a consultant for Bluebird. Cook was "Northern's man in America," whose job it was to investigate possible food-related acquisitions for Northern. Northern held a considerable amount of ready cash that it wished to spend on a European or American food products company, and it retained Cook to look for such a company in the United States. Bluebird, however, was no longer under consideration by Northern, because Northern was interested in Bluebird only if Cook were in charge. One of the companies Cook visited was Showell Farms, Inc., of Maryland.

Life as a consultant was a little too slow for Cook. He testified at his deposition that he quickly became

> fed up with bumming around. I realized I could never be a scratch golfer and was willing to swallow my pride and come back to work for Bluebird in spite of what I said in the past.

In early June, 1979, Cook met with Greenberg to ask for his job back. At an emo-

tional meeting at the O'Hare Hilton in Chicago, Cook admitted to Greenberg that he had left because of distrust of Greenberg, but explained that the company had been such an important part of his life that he had decided to ask to be hired again as Chief Executive Officer. Greenberg was surprised by the turnabout, but agreed to hire Cook as C.E.O., having concluded that Bluebird would be a stronger company with Cook in charge. The Board of Directors approved Cook's return on June 18.

Bluebird's tender offer began on June 11, 1979. It was originally scheduled to continue through June 28, but on June 23 it was extended to July 6. The tender offer statement, sent to all Bluebird shareholders, as well as the supplement sent on June 23,[2] after Cook's return, disclosed that Greenberg had purchased Cook's shares for $12.50 per share and therefore owned a controlling interest. They also disclosed that Cook had resigned and then returned as Chief Executive Officer; that one of the reasons for the tender offer was that Vogelstein and Swensrud wished to divest themselves of their holdings; that Bluebird stock was trading at $9.50 per share on the New York Stock Exchange on May 25, 1979; and that in the event more than 750,000 shares were tendered, shares would be purchased *pro rata*.[3]

The tender offer was over-subscribed, as the tender offer statement suggested it probably would be. Only 57% of the tendered shares were purchased, 60.5% of which were purchased from insiders (*pro rata*).

On June 20, 1979, during the tender offer, Cook called Christopher Haskins at Northern to discuss Cook's coming trip to Europe. The trip had been scheduled during Cook's period of forced idleness, and was to include a report by Cook to Northern on his American scouting efforts, as well as a vacation in Rumania. During the phone call Cook told Haskins of his return to Bluebird; suggested July 12–13 as the time Cook should meet with Northern to report on his consulting activities; and suggested that Northern might also wish to discuss acquiring Bluebird. Haskins's memorandum of the call, addressed to Northern's Policy Committee, read in part:

"Bud Cooke [sic] spoke to [me] . . . on Wednesday night. He gave us the rather startling news that he was now back in charge of Bluebird, although not, of course, owning any shares. He had fixed up some deal with Greenberg who, you will recall, owns approximately 50% of the equity, and as a result, is back in charge. . . .

I suggested that this meant that there was no longer any point in Northern and he talking, but he vigorously said there might be a stronger case for talking. He indicated that something might be done about Greenberg's shares, and was very keen to continue to go on with the visit to Nottingham in the week commencing 9th July.

I have a feeling that Bud would like very much to explore a Northern involvement in Bluebird which we could certainly look at, although you must remember that he sold his shares to Greenberg at 12 dollars against a current market price of approximately 8 dollars, so any deal with Greenberg would look very pricey.

I think, also, that Bud sees possibilities of injecting some of our ideas in America into Bluebird—certainly Showell would come into this category and possibly American Foodservices.

I think it would be a good thing to dust our Bluebird file, to examine the feasibility of us taking a substantial stake in Bluebird, and also Bluebird's own ability thereafter to acquire say the two companies mentioned above."

---

**2.** All of the information in the supplemental statement was timely disclosed, because any shareholder was permitted to withdraw his or her shares from the offer at any time before July 3. Therefore, there was no prejudice, in terms of information available, to any shareholder who had tendered before receipt of the supplemental statement.

**3.** That is, the company would purchase from each tendering shareholder that percentage of 750,000 shares that the shareholder's tendered shares bore to the total of shares tendered.

On July 12, Cook met in England with Northern's management, and, without the knowledge of Greenberg or, indeed, anyone else at Bluebird, discussed the possibility of Northern's acquiring Greenberg's controlling interest. Northern called Cook on July 23 and asked him to arrange a meeting with Greenberg. On July 25, Cook met with a very surprised Greenberg to tell him about Northern's interest. Five days later Greenberg told Cook that he was interested in talking with Northern, and Cook arranged a meeting between Greenberg and Northern for mid-August.

In the first week of August trading in Bluebird stock jumped dramatically. Bluebird, fearing that word of the planned merger discussions had leaked to the market, issued a press release on August 7, saying that "exploratory talks" were scheduled with an undisclosed purchaser.

The smoke being evident, plaintiff Gomberg brought suit on August 10, 1979 to try to find the fire, that is, evidence that the defendants had fraudulently concealed a plan to merge Bluebird and Northern. Four other class actions were filed soon thereafter.

Meetings continued among Northern, Bluebird, Cook, and Greenberg, and on August 23, 1979, the parties reached an "agreement in principle" for Northern to purchase all of Bluebird's stock for $14.875 per share. That agreement was made definitive on October 22, 1979; was approved by Bluebird's shareholders on December 14, 1979; and was consummated on January 4, 1980.

## II.

### Issues on Appeal.

Appellants Staffin, Winderman, Gomberg, Heit and Morris and Sally Leonard

(hereafter, the plaintiffs) raise three issues on appeal. First, they argue that factual issues preclude summary judgment on their claims under Rule 10b–5 and Section 14(e) of the Act. Second, they argue that Greenberg was improperly granted summary judgment on their insider-trading claim under Section 16(b) of the Act. Finally, they argue that the district court committed reversible error in restricting the plaintiffs' discovery in certain respects.

The plaintiffs represent the interests of two classes of Bluebird shareholders. The district court certified, under Rule 23, Fed. R.Civ.P., a class of all Bluebird shareholders who sold in response to the 1979 tender offer (the "tender offer class") and a class of shareholders who sold Bluebird stock on the open market between May 29, 1979,[4] and August 7, 1979 (the "open market class").

Defendant Northern Foods has cross-appealed the district court's order denying its motion to dismiss the complaint for lack of personal jurisdiction, in which Northern alleged that it did not have sufficient contacts with the United States or the Eastern District of Pennsylvania to justify the district court's exercising personal jurisdiction.

## III.

### Rule 10b–5 and Section 14(e) Claims.

The plaintiffs allege that each of the four defendants has violated S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1981), and Section 14(e) of the Act, 15 U.S.C. § 78n(e), by fraudulently failing to disclose to the plaintiff shareholders many of the facts set forth above.[5]

---

**4.** We are perplexed by the plaintiffs' references to the "class" of shareholders who "sold shares of Bluebird stock in the securities markets from *March 1,* 1979, to *August 7,* 1979 (open market class)." Brief of Appellant Staffin, et al., at 8. Because our discussion of the defendants' duties, *infra,* does not depend upon a precise definition of the open market class, we have not endeavored to determine how or why the

plaintiffs arrived at their variant definition of the class.

**5.** Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,

## A. *Defendant Northern Foods, Ltd.*

Our analysis of the fraud claims made against each of the defendants follows two steps. First, was the defendant under a duty to disclose at the time at issue? Second, was the alleged omission or misstatement material? If, under the facts of this case, no duty to disclose exists, or if the undisclosed facts are not material, there is no liability under Rule 10b–5.

In *Chiarella v. United States*, 445 U.S. 222, 229, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980) the Supreme Court discussed the scope of the duty imposed by Rule 10b–5:

> The cases also have emphasized, in accordance with the common-law rule, that '[t]he party charged with failing to disclose market information must be under a duty to disclose it.' *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir. 1975). Accordingly, a purchaser of stock who has no duty to a prospective seller because he is neither an insider nor a fiduciary has been held to have no obligation to reveal material facts. See *General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159, 164 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).

 Stated differently, one who purchases stock on the open market who is neither an insider nor a fiduciary, nor a "tippee" of such a person, need not disclose the reasons for his purchase, even if the purchase is based on knowledge of material facts.[6] Thus, insofar as the plaintiffs seek to hold Northern liable for its *own* conduct in failing to disclose earlier than it did its plans to acquire Bluebird, the claim falls because of the absence of any duty to speak on Northern's part.

The plaintiffs also seek to hold Northern liable for Cook's conduct. Until July 18, 1979, Northern was clearly an outsider, having no duty to any of Bluebird's stockholders, and none of the alleged non-disclosures before that date are remotely attributable to Northern. On July 18, Cook returned to Bluebird as Chief Executive Officer at a time when he was serving as a consultant to, and acting as an agent for, Northern. The record is clear that no one at Northern knew of the tender offer until after it was completed. Nevertheless, the plaintiffs argue that, by virtue of its principal-agent relationship with Cook, Northern became an "insider" of Bluebird with a duty to disclose material information (*i.e.*, Northern's "plans") during Bluebird's tender offer.

Although we do not minimize the plaintiffs' arguments, our holding that neither Cook nor Bluebird is liable for unlawful failures to disclose necessarily exonerates Northern from any liability for authorizing or aiding and abetting the alleged conduct.

## B. *Defendant Greenberg.*

 Greenberg was neither an officer, director nor fiduciary until the point at

---

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 14(e) of the Act applies to tender offers and is worded similarly:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer

> or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive or manipulative.

6. The Williams Act, Pub.L. 90–439, 82 Stat. 454 (1968), *as amended*, Pub.L. 91–567, 84 Stat. 1497 (1970), codified at 15 U.S.C. § 78m(d) and (e) and § 78n(d), (e) and (f), requires an outsider to disclose his purchases when his beneficial ownership in a company exceeds five percent of the company's stock. The plaintiffs have not alleged that any of the defendants violated any provisions of the Williams Act except Section 14(e), the general anti-fraud provision (15 U.S.C. § 78n(e)).

which he acquired a controlling interest in Bluebird. His early purchases of Bluebird stock were reported to Bluebird and to the S.E.C. according to law in his Schedule 13D statements. The plaintiffs have cited no cases which hold that an outsider such as Greenberg has duties to the shareholders of a corporation whose stock he is acquiring beyond those established by statute (*e.g.*, the Williams Act and the Hart-Scott-Rodino Antitrust Improvements Act), and we know of none.[7]

After Greenberg gained a controlling interest in the corporation he arguably had a duty to ensure that management fully disclosed all of the information it was required by law to disclose. However, we do not address the duties of a controlling shareholder in such a situation, because we hold that the corporation and its management met all of their duties of disclosure at all times after Greenberg gained control.

### C. *Defendants Bluebird and Cook.*

The plaintiffs' Consolidated Amended Complaint alleges that the defendants violated Rule 10b–5 and Section 14(e) in failing to disclose at least twenty-seven different facts which the plaintiffs contend were material. It would serve little purpose to discuss each of those facts; rather, we will discuss two of the *groups* of facts that seem to us to be those that most arguably required disclosure: the struggle for control (including the decision to seek a "white knight"), and Bluebird's preliminary merger discussions with Northern. All of the other

allegations either were unsupported by evidence or have been considered under one of the modes of analysis that follow.

### 1. *The Struggle for Control*

Greenberg's efforts to gain control of Bluebird were the sort of activities a reasonable investor considers in deciding whether to hold or to sell shares. Often, a corporation's prospects depend on its management and governance, and the differences in objectives between Greenberg and Cook were arguably significant. Nevertheless, the company was not at any time trading in its own stock during the struggle for control. If Bluebird failed to disclose, that failure was not "in connection with" a purchase or sale of securities.

Judge Sweet of the Southern District of New York succinctly described the nature of the duty to disclose:

> A duty to disclose ... typically arises under Rule 10b–5 when the corporate insider desires to trade, and has been described as an alternative duty rather than an absolute one; to disclose or abstain from trading. *Fridrich v. Bradford*, 542 F.2d 307, 318 (6th Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977).

*State Teachers Retirement Board v. Fluor Corp.*, 500 F.Supp. 278, 291–92 (S.D.N.Y. 1980), *aff'd in relevant part*, 654 F.2d 843 (2d Cir. 1981).

A few cases have imposed certain duties on a corporation under Rule 10b–5 even

---

**7.** At least one commentator has suggested that there is good reason not to impose such a duty:

> In all such transactions the transactor's advantage is the result of his knowledge of his unilateral decision to buy or sell stock at a later time. To trammel his freedom to buy at a later time by requiring disclosure in advance will deprive him of the opportunity to profit from that decision solely because he alone knows of the decision in advance. The only unerodable advantage that the transactor has over the public is his knowledge that he intends to transact at a particular price, or at any rate at prices that may differ from the current market price and that would alter that market price if known publicly. But that advantage, unerodable though it be, is endemic to our exchange system, and no

more validly requires disclosure to others than does the advantage of any negotiator who knows that he is willing to pay more or accept less than he has announced during the course of negotiations.

Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv.L.Rev. 322, 362 (1979).

> Professor Brudney essentially anticipates the holding of *Chiarella*: that is, a duty to disclose depends upon a special relationship between the buyer and seller. If Greenberg owed such a duty to Bluebird's shareholders at all, it arose *after* he had gained control of the company. As it was, the company issued press releases disclosing his acquisition of control immediately after he acquired it.

where the corporation is *not* trading in its own stock. The most noted of the cases is *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), *cert. denied sub nom. Coates v. Securities and Exchange Commission*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (hereafter, *TGS*), which held in part that a corporation which makes a public statement about material corporate events has a duty to make the statement complete enough so as not to be misleading.

■ Although some commentators have urged the broadening of the *TGS* doctrine to require disclosure of all material facts *regardless* of whether the corporation has made any public statements (see, *e.g., Bauman, Rule 10b–5 and The Corporation's Affirmative Duty to Disclose*, 67 Geo.L.J. 935, 937 (1979)), the plaintiffs have not called our attention to any case, including *TGS*, which imposed any duty of disclosure under the Federal Securities Laws on a corporation which is *not* trading in its own stock and which has *not* made a public statement.[8] We decline to do so on the facts of this case.

Thus, until the point at which Bluebird chose to make a public statement, it had no duty to disclose Greenberg's efforts to its shareholders. When it chose on March 27, 1979, to make a statement about Cook's sale to Greenberg, that statement was required to include every "material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . ." Rule 10b–5(2).

Neither Bluebird's first press release nor the ones that followed mentioned the erst-

while and abortive effort to seek a "white knight" nor did they mention the antipathy that Cook's management group had for Greenberg. Nevertheless, we do not believe that the intent of the *TGS* court was to create a doctrine requiring a corporation to reveal every material corporate fact known to it every time it makes a public statement. Rather, the court's decision was far narrower:

> [W]e hold that Rule 10b–5 is violated whenever assertions are made [by a company] . . . in a manner reasonably calculated to influence the investing public . . . if such assertions are *false* or *misleading* or are so *incomplete as to mislead. . . . i.e.,* whether it conveyed to the public a false impression. . . ."

401 F.2d at 862 (emphasis added).

■ Bluebird's press releases told of Cook's sale of a controlling interest to Greenberg. They were not false, they were not misleading, nor were they so incomplete as to mislead, *i.e.*, as to convey to the public a false impression. No more was required under *TGS* or any other case, at least at a time when none of the defendants were trading in securities with the plaintiffs.[9]

■ The plaintiffs also suggest that Bluebird and Cook committed fraud in not disclosing the struggle for control and the search for the "white knight" in the tender offer statement. The plaintiffs argue that the omitted facts were material under the test enunciated in *TSC Industries Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976): that is, that a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding

---

**8.** The importance of *Texas Gulf Sulphur* is that where statements *are actually made*, the strictures of the "in connection with" clause are loosened somewhat. Even if the corporation did not make the statements "in connection with" its purchase or sale of securities, an investor can recover under Rule 10b–5 for misrepresentations in those statements. See 401 F.2d at 857–62.

**9.** Cook was an insider when he sold his shares to Greenberg, and he did not disclose the reasons for the sale to the public. Nevertheless, we will not impose a duty of public disclosure upon a controlling shareholder who is selling his holdings to a fully informed buyer. The "in connection with" clause simply does not create a duty to the public in these circumstances. Cf. *Blue Chip Stamps v. Manor Drug Stores*,

whether to sell his or her stock.[10] We agree with the district court that "Greenberg's position as controlling majority shareholder of Bluebird was fully disclosed in the tender offer materials. . . . [R]easonable minds cannot differ on the materiality of these alleged nondisclosures. There was no 'substantial likelihood' that the detailed history of how Greenberg attained control of Bluebird 'would have assumed actual significance in the deliberations of the reasonable shareholder' considering whether to tender his shares, [*TSC Industries Inc. v. Northway, Inc.,*] 426 U.S. at 449, 96 S.Ct. at 2132. . . ." *Staffin v. Greenberg,* 509 F.Supp. at 835.

The tender offer materials fully disclosed the financial situation of the company, Greenberg's controlling interest, the price he paid for that controlling interest, the desire of Swensrud and Vogelstein to reduce their holdings, and Cook's return as Chairman of the Board and Chief Executive Officer. Greenberg's acquisition of control substantially affected neither the management of the company nor its direction. Those who prepared the tender offer materials were entirely justified in assuming that a recitation of some of the directors' emotional reactions toward Greenberg in March, 1979, was entirely immaterial to a shareholder trying to decide whether a share of Bluebird stock was or was not worth $10.00 in early July, 1979.

*TSC v. Northway* adopted a standard of materiality high enough to avoid management's "bury[ing] the shareholder in an avalanche of trivial information—a result that is hardly conducive to informed decision-making." 426 U.S. at 448–49, 96 S.Ct. at 2132. No reasonable fact-finder could have found a *substantial* likelihood that a reasonable shareholder would have found such alleged nondisclosures important. Moreover,

" 'The securities laws, while their central insistence is upon disclosure, were never intended to attempt . . . measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is 'disclosed,' unless the impurities are translated into actionable deeds or omissions both objective and external.' *Lavin v. Data Systems Analysts, Inc.,* 443 F.Supp. 104 (1977), quoting from *Stedman v. Storer,* 308 F.Supp. 881, 887 (S.D.N.Y.1969); *see Golub v. PPD Corp.,* 576 F.2d 759 (8th Cir. 1978)."

*Biesenbach v. Guenther,* 588 F.2d 400, 402 (3d Cir. 1978). Neither the "white knight" nor the directors' feelings ever became "objective and external."

2. *Preliminary Merger Discussions.*

The plaintiffs argue that Cook and Bluebird should have disclosed during the tender offer Cook's July 23 conversation with Mr. Haskins of Northern, and that they should have disclosed that conversation and later preliminary merger discussions to the open market class.

Both Rule 10b–5 and Section 14(e) make unlawful a failure to disclose any "material fact" "in connection with" the purchase or sale of any security. There is no dispute that Bluebird was under a duty of disclosure, generally, during the tender offer. We are obliged, then, to examine the materiality of the alleged nondisclosures.

At least eight courts have concluded that it is not necessary to disclose, in connection with a purchase or sale of securities, the occurrence of preliminary merger discussions. *Missouri Portland Cement Co. v. H. K. Porter,* 535 F.2d 388, 398 (8th Cir. 1976); *Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075 (5th Cir. 1970); *Bucher v. Shumway,* [1979–80] F.Sec.L.Rep. (CCH) ¶ 97,142 (S.D.N.Y.1979), *aff'd,* 622 F.2d 572 (2d Cir.), *cert. denied,* 449 U.S. 841,

421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

10. *TSC* was defining materiality only for purposes of the anti-fraud provisions of the proxy regulations (SEC Rule 14a–9, 17 C.F.R. § 240.-14a–9 (1981)), but this court has expressly

adopted the definition for Rule 10b–5 actions, *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 647 (3d Cir. 1980), and we now likewise adopt it as the governing test for an action based on Section 14(e) of the Act.

101 S.Ct. 120, 66 L.Ed.2d 48 (1980); *List v. Fashion Park, Inc.*, 227 F.Supp. 906 (S.D.N.Y.1964) *aff'd*, 340 F.2d 457 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1318 (W.D.Mich.1978); *Scott v. Multi-Amp Corp.*, 386 F.Supp. 44, 65 (D.N.J.1974); *Crane Company v. Anaconda Company*, 411 F.Supp. 1208, 1210 (S.D.N.Y.1975). *But see Levin v. Marder*, 334 F.Supp. 1050 (W.D.Pa.1972).

The district court in this case relied on many of the cases cited above in granting summary judgment in favor of the defendants. *Staffin v. Greenberg*, 509 F.Supp. at 836.

The reason that preliminary merger discussions are immaterial as a matter of law is that disclosure of them may itself be misleading. *See Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d at 1084–85. A substantial body of opinion suggests that disclosure of preliminary merger discussions would, by and large, do more harm than good to shareholders and the values embodied in the anti-fraud provisions of the Act. The Senate Subcommittee on Securities of the Committee on Banking and Currency, heard extensive testimony in the related area of "takeover bids," that is, cash tender offers.

> Obviously, a company intending to make a tender offer strives to keep its plans secret. If word of the impending offer becomes public, the price of the stock will rise towards the expected tender price. Thus, the primary inducement to stockholders—an offer to purchase their shares at an attractive price above the market—is lost, and the offeror may be forced to abandon its plans or to raise the offer to a still higher price. The cost of an offer to purchase hundreds of thousands of shares might prove prohibitive if the price had to be increased only a few dollars per share. . . .
>
> To insure secrecy and avoid leaks and rumors and because the relationship between the tender price and the market price is so critical, tender offers are normally made to stockholders immediately after a decision to make the offer is reached and a price has been determined. In spite of all precautions, there have been cases where tender offers have been preceded by leaks and rumors which caused abnormal market problems.

Transcript, Hearings before the Subcommittee on Securities of the Committee on Banking and Currency, United States Senate, 90th Cong., 1st Sess., S. 510, p. 72, March 22, 1967, statement of Mr. Calvin on behalf of the New York Stock Exchange, Inc. *See also* NYSE Company Manual at A–19–20.

The Williams Act, as amended largely in response to such testimony,[11] contemplates public disclosure and filing with the S.E.C. only after a tender offer is initiated. *See* 15 U.S.C. § 78n(d)(1).

> The American Stock Exchange concurs:
>
> Occasionally corporate developments give rise to information which, although material, is subject to rapid change. If the situation is about to stabilize or resolve itself in the near future, it may be proper to withhold public announcement until a firm announcement may be made, since successive public announcements concerning the same subject but based on changing facts may confuse or mislead the public rather than enlighten it.
>
> In the course of a successful negotiation for the acquisition of another company, for example, the only information known to each party at the outset may be the willingness of the other to hold discussions. Shortly thereafter it may become apparent to the parties that it is likely an agreement can be reached. Finally agreement in principle may be reached on specific terms. In such circumstances a company need not issue a public announcement at each stage of the negotiations, describing the current state of constantly changing facts, but may

---

**11.** As originally drafted, the Williams Act provided for a "pre-release" submission of tender offer materials to be made to the S.E.C. for the agency's review.

await agreement in principle on specific terms.

American Stock Exchange Manual at 104.

Those persons who would buy stock on the basis of the occurrence of preliminary merger discussions preceding a merger which never occurs, are left "holding the bag" on a stock whose value was inflated purely by an inchoate hope. If the announcement is withheld until an agreement in principle on a merger is reached, the greatest good for the greatest number results. If the merger occurs, all of the company's shareholders usually benefit; if no merger agreement is reached, the stock performs as it would have in any event.[12]

Where an agreement in principle has been reached a duty to disclose *does* exist. Because "[i]t might be said of fraud that age cannot wither nor custom stale its infinite variety," *In The Matter of Cady, Roberts and Co.*, 40 S.E.C. 907, 911 n.12 (1961), we do not decide under what circumstances liability might attach to a failure to disclose discussions which have not reached an agreement in principle, but are in some sense the functional equivalent thereof. For example, in *Thomas v. Duralite Co. Inc.*, 524 F.2d 577, 585 (3d Cir. 1975), this court upheld a finding of liability on the part of an insider who intentionally suspended discussions that had already created the "likelihood" of a merger. The district court found that the insider had suspended the discussions so that he (and the group he represented) could purchase the stock of a single large shareholder more cheaply. There is no evidence here that Cook's discussions with Northern were nearly so developed. Situations such as those involved in the *Duralite* case will probably be unusual, and were certainly not present in this case.

Therefore, the district court correctly granted summary judgment to the defendants on the issue of their alleged failure to disclose the occurrence of preliminary merger discussions.

## IV.

### *Section 16(b) Claim.*

█ The plaintiffs argue that Greenberg violated Section 16(b) of the Act, 15 U.S.C. § 78p,[13] by buying Bluebird stock on and after February 24, 1979 and selling it at a profit on August 23, 1979. Section 16(b) prohibits controlling shareholders from realizing profits on a purchase and sale which occur within six months of each other.

The district court rejected the plaintiffs' claims on the grounds, (1) that the plaintiffs had no standing to sue under Section 16(b) and, (2) that no sale of Greenberg's stock took place until December 14, 1979 at the earliest. *Staffin v. Greenberg*, 509 F.Supp. at 840.

We do not address the standing issue because we agree with the district court that Greenberg was not "irrevocably bound" to sell his shares to Northern until the other Bluebird shareholders approved the merger, on December 14, 1979, and thus permitted Northern's exercise of the proxy granted by Greenberg. See *Kern County Land Co. v. Occidental Petrolum Corp.*, 411 U.S. 582, 603, 93 S.Ct. 1736, 1749, 36 L.Ed.2d 503 (1973); *Champion Home Builders Co. v. Jeffress*, 490 F.2d 611, 616 (6th Cir. 1974), *cert. denied, sub nom., Jeffress v. Kramer*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). Greenberg's proxy to Northern provided that Greenberg's shares should be

---

12. If, as is often the case, a merger will benefit both the acquired company and its shareholders, an insider may be obliged to maintain strict confidentiality to avoid ruining the corporate opportunity through premature disclosure. Indeed, the record is clear in this case that Northern very nearly withdrew from merger discussions upon hearing of Bluebird's publication of the August 7 press release.

13. Section 16(b) provides in part:

> For the purpose of preventing the unfair use of information which may have been obtained by [an owner of more than ten percent of any class of stock of a company, or a] . . . director or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer. . . .

voted for or against the merger according to the wishes of the majority of other shareholders. Greenberg's last purchase was on May 15, 1979. More than six months elapsed between that purchase and his becoming irrevocably bound to sell the stock on December 14, 1979. Section 16(b) was therefore not violated.

## V.

The plaintiffs ask us to reverse the district court on the ground that they were prejudiced by the court's discovery rulings which they argue made it impossible for them adequately to develop the record. We have reviewed the record and the district court's orders, and believe that the plaintiffs were accorded ample latitude fairly and fully to develop their case. We can find no abuse of the district court's discretion and therefore will affirm its rulings. *Montecatini Edison, S.p.A. v. E.I. duPont de Nemours & Co.*, 434 F.2d 70 (3d Cir. 1970).

We will likewise affirm the district court's denial of Northern's motion to dismiss for lack of personal jurisdiction, substantially for the reasons given by the district court. *Staffin v. Greenberg*, 509 F.Supp. at 831–32.

### Conclusion

We believe that there was a clear absence of any obligation to disclose that which was allegedly unlawfully withheld. This case seems to have arisen because an English company, in the market for a prompt American acquisition, decided that Bluebird Corporation was worth five dollars more per share than its American shareholders, on the basis of virtually identical information, had concluded it was worth six weeks earlier. The timing of Northern's decision—six weeks after the conclusion of Bluebird's tender offer—perhaps cost it the defense of this lawsuit, but its unfortunate timing is not actionable under the securities laws. "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud." *Chiarella*, 445 U.S. at 234–35, 100 S.Ct. at 1117–18. Here, there was none.

The order of the district court will therefore be affirmed.