

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-2004

# US Small Bus Admn v. Katawczik

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3475

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"US Small Bus Admn v. Katawczik" (2004). *2004 Decisions*. Paper 399.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/399

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-3475

———————

U.S. SMALL BUSINESS ADMINISTRATION,
as RECEIVER FOR BISHOP CAPITAL, L.P.,
Appellant

v.

DENNIS M. KATAWCZIK; KEVIN T. WEIR; CAROL
M. WEIR; STYLING TECHNOLOGY CORPORATION

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 00-cv-01132
District Judge:  The Honorable Gary L. Lancaster

———————

Argued:  July 13, 2004

———————

Before: SLOVITER, BARRY, and FISHER, <u>Circuit Judges</u>

———————

(Opinion Filed:  August 12, 2004)

———————

Anthony J. Basinski, Esq. (Argued)
Pietragallo, Bosick & Gordon
301 Grant Street
One Oxford Centre, 38th Floor
Pittsburgh, PA  15219

<u>Attorney for Appellant</u>

Kevin P. Allen, Esq. (Argued)
William M. Wycoff, Esq.
Thorp, Reed & Armstrong
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA   15219

Attorneys for Appellees Styling Tech Corp. and Dennis M. Katawczik

Ellen L. Surloff, Esq.
David L. McClenahan, Esq.
Kirkpatrick & Lockhart
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA   15222

Attorneys for Appellees Kevin T. Weir and Carol M. Weir

---

OPINION

---

BARRY, Circuit Judge

We are asked to decide whether officers and directors have a duty to disclose to a warrant holder a third party's offer to purchase outstanding shares of the underlying stock, even when there is no provision in the warrant itself imposing such a duty.  The District Court held that there was no such duty, and granted summary judgment in the defendants' favor.  We agree, and will affirm.

## I.  BACKGROUND

Because the factual history of this case is long and complicated, and the parties are

familiar with these facts, we provide only a summary here.

Ft. Pitt Acquisition, Inc. ("Ft. Pitt"), a closely held corporation, owned the North American manufacturing and distribution rights for a line of hair care products branded "Framesi." Defendants Dennis M. Katawczik and Kevin T. Weir were officers, directors, and minority shareholders of Ft. Pitt, and together eventually owned a controlling interest of the company. Bishop Capital, L.P. ("Bishop Capital") loaned Ft. Pitt $600,000 in 1990, and received in return, on July 16, 1990, the Common Stock Purchase Warrant ("Warrant") at issue in this case. The Warrant gave its holder the right to purchase 5% of Ft. Pitt's stock for $44,000,[1] and gave Ft. Pitt a right of first refusal – a right to match any bona fide offer for the Warrant that Bishop Capital received from a third party. The Warrant expired on December 21, 1998, six years after the loan was paid.

On June 5, 1995, the U.S. District Court for the District of New Jersey, as the Receivership Court, appointed the U.S. Small Business Association ("SBA") as Receiver for Bishop Capital because of Bishop's violations of SBIC rules. The SBA hired Daniel David to act as its agent, and to marshal and liquidate Bishop Capital's assets. In early 1996, David was contacted by Donald Chadwick, who was forming a partnership called Cardinal Associates, L.P. ("Cardinal") in order to acquire Bishop Capital's assets. On December 20, 1996, Cardinal offered to buy the Warrant from the SBA as part of an asset

---

[1]Bishop Capital II, L.P. ("Bishop II") contributed $200,000 of the $600,000 loaned to Ft. Pitt, and, in return, received a 1/3 interest in the Warrant. Bishop II later assigned its 1/3 interest in the Warrant to Cardinal Associates, L.P.

3

package. After receiving a report valuing the Warrant at between $72,800 and $93,600, the SBA decided to accept Cardinal's offer, and did so by letter dated April 15, 1997, subject to approval by the Receivership Court and Ft. Pitt's right of first refusal. On May 12, 1997, David notified Ft. Pitt by letter of Cardinal's offer, and offered to sell the entire package of assets to Ft. Pitt. On or about May 16, Ft. Pitt's lawyer rejected the offer, claiming that the SBA was obligated, by the terms of the Warrant, to make a separate offer for the sale of the Warrant alone.

On June 11, 1997, Cardinal offered to buy a smaller package of Bishop Capital's assets, either individually or as a group, including its 2/3 interest in the Warrant for $124,000. On October 28, 1997, the SBA accepted Cardinal's offer by letter, and required a $5,000 deposit. Notably, the acceptance, signed by both the SBA and Cardinal, gave the SBA the option of voiding the agreement if it received a better offer for the Warrant at any time prior to closing. The SBA, however, never offered Ft. Pitt its right of first refusal. When, on January 28, 1998, Ft. Pitt wrote to the SBA inquiring about any offers received by the SBA for the Warrant, the SBA did not notify Ft. Pitt about its agreement with Cardinal, and instead offered to sell the Warrant to Ft. Pitt for $205,500. Ft. Pitt rejected the offer.

Rather than afford Ft. Pitt its right of first refusal, Cardinal and the SBA decided that the SBA would exercise the Warrant, and then sell the underlying stock to Cardinal. This idea manifested in March 1998, and was confirmed by letter on July 6, 1998, when

4

Cardinal gave the SBA an additional $26,000 deposit.

Meanwhile, the SBA, Cardinal, and Katawczik and Weir were each also negotiating with Styling Technology Corporation ("Styling"). On January 16, 1998, Styling discussed with the SBA the possibility of entering into a two year option agreement to purchase the Ft. Pitt stock that the SBA would acquire by exercising the Warrant. The SBA rejected this in favor of the guaranteed sale to Cardinal. On February 18, 1998, Cardinal entered into an agreement that gave Styling the option to buy Cardinal's Ft. Pitt shares at $40 per share, and later agreed to the same arrangement for any additional shares that Cardinal obtained from the SBA.

Yet another buyer was interested in Ft. Pitt stock – Graham Webb International Limited Partnership ("Graham Webb"). Katawczik and Weir met with Graham Webb's president, Robert Taylor, in Chicago on July 13, 1998, and agreed that Graham Webb would send Ft. Pitt a letter of intent, later dated July 29, 1998, indicating its intention to buy all of Ft. Pitt's stock for $45 million, or $166 per share.[2] Between this meeting and

_____

[2]The parties dispute whether an agreement was reached. Taylor testified that the Chicago meeting ended with a handshake agreement, and Katawczik saying, "Congratulations, boys. You just bought yourself a [hair] color company." But the July 29, 1998 letter of intent was never signed by anyone at Ft. Pitt, and, thus, became void by its own terms on August 14, 1998 when it remained unsigned. It also contains clear language indicating that a complete agreement had not been reached. Furthermore, Graham Webb's proposed $2 million deposit would "at all times be and remain the property of [Graham Webb]," and would be used as a source of funds for payment only "[i]f the parties are successful in negotiating the terms of an acceptable Transaction." Otherwise, Graham Webb could "abandon the Transaction and withdraw the [deposit]

(continued...)

the receipt of Graham Webb's letter of intent, Katawczik and Weir agreed instead, on July 15, 1998, to sell just their personally held Ft. Pitt stock to Styling for $30 million, or $190 per share.[3] This sale closed on August 4, 1998, and was publicized that day on the PR Newswire. David claims to have learned of this purchase a few weeks after it occurred, and his notes indicate that he knew of it by no later than September 2, 1998.

On August 11, 1998, the SBA exercised its Warrant, thereby purchasing 5% of Ft. Pitt's shares for $44,000.[4] On October 23, 1998, the SBA entered into a written Agreement of Sale to sell the underlying Ft. Pitt stock to Cardinal for $13.82 per share.[5] It filed a motion with the Receivership Court to approve the sale, and attached a valuation report while explaining that the $13.82 per share "represents the best value for the receivership estate." The Receivership Court authorized the transaction, and the sale closed on December 2, 1998. On that date, the SBA was aware of Styling's acquisition of Katawczik and Weir's stock, but was unaware of the Graham Webb offer.

---

[2](...continued)
without liability to the Seller Katawczik, Weir or any other person." It certainly appears that no binding agreement was ever reached with Graham Webb.

[3]The SBA alleges that Katawczik and Weir agreed to sell their stock to Styling because Styling somehow extorted them, by way of a draft complaint, with its knowledge of their alleged malfeasance in running Ft. Pitt. These allegations, even if true, have no bearing on the SBA's federal securities law claim, and do not impact our analysis of whether summary judgment was appropriate.

[4] 1/3 of those shares would go to Cardinal, which held Bishop II's 1/3 interest in the Warrant.

[5]The Agreement provides for the sale of 8,970 shares for $124,000.

The SBA commenced this lawsuit in the U.S. District Court for the Western District of Pennsylvania against Katawczik and Weir, Weir's wife, and Styling on June 8, 2000.[6] It alleged, in its Second Amended Complaint, violations of Section 10(b) of the Securities and Exchange Act of 1934; violations of SEC Rule 10b-5; and state law causes of action. With respect to its federal securities claim against Katawczik and Weir (Count I), the SBA alleged that Katawczik and Weir intentionally and recklessly failed to disclose to it the Graham Webb and Styling negotiations and agreements; it reasonably relied on this nondisclosure when it exercised its Warrant and sold its Ft. Pitt shares; and this reliance caused it to sell those shares to Cardinal for less than they were worth.

On February 22, 2002, Katawczik and Weir filed a motion for summary judgment, arguing that the SBA's federal securities law claim failed as a matter of law. The District Court granted the motion on July 31, 2003, finding that Katawczik and Weir did not owe the SBA a duty to disclose either the Graham Webb negotiations or the sale to Styling because both took place while the SBA was still a warrant holder, to whom no fiduciary duty is owed. The Court dismissed the SBA's state law claims without prejudice, declining to exercise supplemental jurisdiction over them once it had dismissed the federal claim. The SBA appeals.[7]

---

[6] Styling subsequently filed for bankruptcy, and the action against it has been stayed.

[7] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

7

## II.  DISCUSSION

### A.  Federal Securities Fraud Claim against Katawczik and Weir

Our standard of review on summary judgment is well-established: "Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law.  In determining whether a genuine issue of fact exists, we resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party."  Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004) (internal citations omitted).  On appeal, "[w]e apply the same standard that the District Court should have applied."  Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 253 (3d Cir. 2004).

The SBA's federal claim against Katawczik and Weir is premised on Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), which make it unlawful to commit fraud in connection with the purchase or sale of a security.  To state a valid claim under these provisions, "a plaintiff must show that the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury."  In re Ikon Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002) (citing GFL Advantage Fund, LTD v. Colkitt, 272 F.3d 189, 212 (3d Cir. 2001), and Weiner v. Quaker Oats Co., 129 F.3d 310,

315 (3d Cir. 1997)).

The purchase or sale of securities that is the basis for the SBA's Section 10(b) and Rule 10b-5 claim is its sale of Ft. Pitt stock to Cardinal, agreed to on October 23, 1998 and finalized on December 2, 1998, a sale which occurred without the SBA's knowledge of the Graham Webb offer.[8]  Had it known of the "better offer," it argues, it would have "contacted Graham Webb, demanded information, contacted Styling and asked Cardinal to pay more"; "pursued all available options to protect the assets of the Bishop receivership and/or to ensure that Defendants Weir and Katawczik complied with their duties as Officers and Directors of Ft. Pitt Acquisition Inc."; and "terminated the understanding with Cardinal."  Appellant's Reply Br. at 11-12.  The economic loss the SBA allegedly suffered – the difference in price per share between the Graham Webb offer and the sale to Cardinal – was, it concludes, "proximately caused by the Defendants' omissions because the Receiver sold its shares without knowing of the value that Graham Webb had placed upon the shares of Ft. Pitt and without being afforded the opportunities discussed above."  Id.

Whatever merit there might be to the SBA's claim that it suffered injury

_____

[8]To be clear, the SBA's exercise of the Warrant on August 11, 1998 is not the transaction at issue.  David testified that the SBA would have exercised the Warrant even if it had known about the Graham Webb offer because the Warrant was to expire in December 1998.  And the only nondisclosure at issue is the Graham Webb offer, because the SBA knew of Katawczik and Weir's sale to Styling long before the SBA entered into an Agreement of Sale with Cardinal.

proximately caused by this nondisclosure, its claim fails because Katawczik and Weir had

no duty to disclose the Graham Webb offer to the SBA as a warrant holder. See GFL

Advantage Fund, 272 F.3d at 213 (the analysis under Section 10(b) and Rule 10b-5

involves two steps: "'First, was the defendant under a duty to disclose at the time at

issue? Second, was the alleged omission or misstatement material?'") (quoting Staffin v.

Greenberg, 672 F.2d 1196, 1202 (3d Cir. 1982)). "A duty to disclose arises only when

one party to a transaction has material information that the other party is entitled to have

because of some relationship of trust and confidence between the parties, such as when

one party is a fiduciary, corporate insider, or 'tippee.'" Id. The SBA argues that

Katawczik and Weir owed it, as a warrant holder, the same duties they owed to minority

shareholders. We reject this argument.

First, as counsel for the SBA conceded at oral argument, there is nothing in the

Warrant itself that imposes upon Ft. Pitt or its directors or officers any duty – fiduciary or

otherwise – to inform the Warrant holder when directors or officers decide to sell their

personally held shares to a third party. Second, the SBA has identified no other source of

this asserted duty from state or federal statutes, regulations, or common law.

Instead, the SBA relies upon the definition of "equity security" in 15 U.S.C. §

78c(a)(11), which includes warrants for purposes of Section 10(b) and Rule 10b-5. See

also Kusner v. First Pa. Corp., 531 F.2d 1234, 1237 (3d Cir. 1976) ("The convertible

debentures and the warrants here involved are securities within the meaning of both the

10

Securities Act and the Securities Exchange Act."). But defining a warrant as an "equity security" does not create a duty owed to the warrant holder; it merely gives the warrant holder standing to sue under the federal securities laws in the event that some duty owed to it is breached in connection with the purchase or sale of securities. Compare Kusner, 531 F.2d at 1237-39 (a warrant holder has standing to sue under Rule 10b-5 for material misrepresentations made in connection with his purchase of the warrant), with Helvering v. Southwest Consol. Corp., 315 U.S. 194, 200-01 (1942) ("Whatever rights a warrant holder may have to require the obligor corporation to maintain the integrity of the shares covered by the warrants ... he is not a shareholder . . . His rights are wholly contractual . . . . And he cannot assert the rights of a shareholder") (internal quotations omitted). The definition of "equity security," then, imposes no duty.

The SBA also directs our attention to Pittsburgh Terminal Corp. v. Balt. & Ohio R.R. Co., 680 F.2d 933 (3d Cir. 1982), in which we held that SEC Rule 10b-17, 17 C.F.R. § 240.10b-17 ("Rule 10b-17"), imposed upon directors and officers a duty to inform holders of convertible debentures (roughly analogous to the warrant holder here) when those directors and officers purposely timed the record date for payment of dividends so that the bondholders could not convert in time to receive the dividend. The majority agreed upon only one source of duty to those debenture holders: the specific language of Rule 10b-17, which deals with publicly traded securities only and imposes a duty to disclose when dividends are to be paid. Thus, Pittsburgh Terminal simply does not apply

11

here.

The District Court relied on Lorenz v. CSX Corp., 1 F.3d 1406 (3d Cir. 1993), for the proposition that "[a] corporation's obligations toward its debentureholders are defined by the terms of the indenture, and section 10(b) imposes no additional duties." Id. at 1418. We agree that reliance on Lorenz for this general proposition was appropriate. The SBA, much like the holders of convertible debentures in Lorenz, was not a shareholder, and, therefore, did not enjoy the same status as a shareholder vis à vis the corporation's directors and officers. Consequently, Katawczik and Weir had no fiduciary duty to disclose the Graham Webb offer to the SBA. Moreover, there is nothing in the Warrant itself – and the Warrant is, after all, a contract – which even refers to much less provides a duty to disclose anything akin to the conduct challenged here. Because Katawczik and Weir did not breach any provision of the Warrant, they cannot be held liable for fraudulent nondisclosure under Section 10(b) and Rule 10b-5. Whether they are liable under one or more of the state law claims now pending in state court – perhaps because of the relationship between the parties, for example – may well be an entirely different issue.

## B.    Supplemental Jurisdiction Over State Law Claims

Having dismissed the SBA's federal claim, the District Court declined to exercise supplemental jurisdiction over the state law claims, and dismissed them without prejudice. Under 28 U.S.C. § 1367(c)(3), the District Court may do so if it has dismissed all claims over which it has original jurisdiction. That decision "is committed to the

12

sound discretion of the district court," <u>Queen City Pizza, Inc. v. Dominoes Pizza, Inc.</u>, 124 F.3d 430, 444 (3d Cir. 1997), and so we review for an abuse of discretion. <u>See, e.g.,</u> <u>Pryzbowski v. U.S. Healthcare, Inc.</u>, 245 F.3d 266, 276 (3d Cir. 2001). We find no abuse of discretion here.

### III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's order granting defendants' motion for summary judgment and dismissing the SBA's supplemental state law claims without prejudice.